[Cite as *Brammer v. Meachem*, 2011-Ohio-519.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

KENNETH R. BRAMMER,                                   CASE NO. 9-10-43

   PLAINTIFF-APPELLEE,

 v.

BOBBIE JO MEACHEM,                               O P I N I O N
NKA JOHNSON,

   DEFENDANT-APPELLANT.

**Appeal from Marion County Common Pleas Court
Family Division
Trial Court No. 2005 PC 00204**

**Judgment Affirmed**

**Date of Decision: February 7, 2011**

APPEARANCES:

   *Jon L. Jenson* **for Appellant**

   *Kevin P. Collins* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Bobbie Jo Meachem n.k.a. Johnson (hereinafter "Bobbie Jo"), appeals the judgment of the Marion County Court of Common Pleas, Juvenile Division, which designated plaintiff-appellee, Kenneth R. Brammer (hereinafter "Kenneth"), the residential parent and legal guardian of the parties' minor child and modified the parties' parental rights and responsibilities as originally stated in the parties' October 12, 2005 agreement. For the reasons that follow, we affirm.

{¶2} The parties are the parents of Brooklyn Faye Brammer, who was born in 2003, and are the parents of record of Owen Scott Brammer, who was born in February 2008.[1] On May 26, 2005, Kenneth filed a petition for allocation of parental rights and responsibilities for the care and custody of Brooklyn. On October 12, 2005, the parties entered into an agreement designating Bobbie Jo as the residential parent and legal custodian of Brooklyn.

{¶3} Subsequently, on July 25, 2009, Bobbie Jo married Chris Johnson, a marine who was stationed in North Carolina. As a result of her marriage, Bobbie Jo notified Kenneth that she intended to relocate to the State of North Carolina

---

[1] We note that during the lower court proceedings regarding the custody of Brooklyn, the trial court and the parties made several references to Brooklyn's younger brother, Owen Scott Brammer (born in February 2008). Even though Kenneth and Bobbie Jo are also the parents of record in Owen's case, Case No. 2008 PC 00181, the custody of Owen was not joined with Brooklyn's case as Bobbie Jo had filed a motion for genetic tests in Owen's case alleging that Kenneth was not the biological father of Owen.

with Brooklyn and Owen. Consequently, on August 14, 2009, Kenneth filed a motion for modification of parental rights and responsibilities and a motion for orders pendente lite. On August 28, 2009, Kenneth filed a motion for an ex parte order with an affidavit in support. Thereafter, the trial court granted Kenneth's motion and reallocated the primary parental rights and responsibilities for Brooklyn temporarily to Kenneth. The trial court further prohibited Bobbie Jo from removing Brooklyn from the State of Ohio and limited her visitations to supervised visitation on alternate weekends for three hours each on Saturday and Sunday.

{¶4} On September 3, 2009, Bobbie Jo filed a motion to set aside the ex parte order and filed a motion for modification of parental rights and responsibilities. A hearing on the ex parte order was held on September 4, 2009. Following the hearing, the trial court designated Bobbie Jo as the temporary residential parent and legal custodian of the minor child and ordered Kenneth to return Brooklyn to Bobbie Jo. The trial court additionally granted Kenneth rights of visitation and ordered Bobbie Jo to transport Brooklyn from North Carolina to Ohio for visitation purposes.

{¶5} On September 14, 2009, the trial court issued an order of referral to the family services coordinator for an evaluation and an investigation pursuant to R.C. 3109.04(C) and Civ.R. 75(D). As part of her investigation, the investigator,

Stephanie Kreisher, met with Kenneth and Bobbie Jo, performed home studies at both of their residences, and performed a child assessment with both parents. (Dec. 17, 2009 Tr. at 38-40). At the conclusion of her investigation, Ms. Kreisher prepared a report in which she ultimately recommended that Kenneth be designated the residential parent of Brooklyn. (Dec. 17, 2009 Tr. at 40); (Court's Ex. 1).

{¶6} On December 14, 2009, Bobbie Jo filed a motion for an in camera interview of the parties' minor child.

{¶7} On December 17, 2009, a final hearing on the matter was conducted, and after the presentation of evidence, the trial court issued an order prohibiting both parties from removing the minor child from the State of Ohio. Thereafter, the trial court conducted an in camera interview with Brooklyn.

{¶8} On January 13, 2010, the trial court granted Kenneth's motion for reallocation of parental rights and responsibilities for the care and custody of Brooklyn. On January 20, 2010, Bobbie Jo appealed the trial court's decision, but on February 10, 2010, this Court dismissed the case finding that the trial court's judgment was not a final, appealable order as the trial court had failed to address the issue of child support.

{¶9} On April 22, 2010, Bobbie Jo filed a request with the trial court for a status conference, which was held on May 12, 2010. On May 20, 2010, the trial

court issued its order finding that it was in the minor child's best interest that there should not be an exchange of child support.

{¶10} Now Bobbie Jo appeals and raises the following two assignments of error.

## ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FINDING THERE HAD OCCURRED A CHANGE IN CIRCUMSTANCES AND THAT SUCH CHANGE HAD A MATERIAL ADVERSE EFFECT ON THE CHILD WARRANTING A MODIFICATION OF CUSTODY.**

{¶11} In her first assignment of error, Bobbie Jo argues that the trial court erred and abused its discretion in finding that a change in circumstances had occurred and that this change had had a material adverse effect on the minor child, which consequently warranted a modification of custody.

{¶12} R.C. 3109.04(E)(1)(a) governs the trial court's authority to modify an existing decree allocating parental rights and responsibilities, and in pertinent part, provides:

> **The court *shall not modify a prior decree* allocating parental rights and responsibilities for the care of children *unless it finds*, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, *that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child.* In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a**

> **modification is in the best interest of the child and one of the following applies:**
> \* \* \*
> **(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.**

(Emphasis added).

{¶13} "[W]hether there are changed circumstances is a threshold inquiry that must be determined prior to examining whether a change in parental responsibility would be in the best interests of the child." *Fox v. Fox*, 3d Dist. No. 5-03-42, 2004-Ohio-3344, ¶38, citing *Clark v. Smith* (1998), 130 Ohio App.3d 648, 653, 720 N.E.2d 973. See, also, *Cichanowicz v. Cichanowicz*, 3d Dist. No. 3-08-04, 2008-Ohio-4779, ¶6. With respect to a determination that a change in circumstances has occurred, the change must be "a change of substance, not a slight or inconsequential change." *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 418, 674 N.E.2d 1159. As the Court in *Davis* stated, "'[t]he changed conditions \* \* \* must be substantiated, continuing, and have a materially adverse effect upon the child. The latter is the paramount issue.'" 77 Ohio St.3d at 417, quoting *Wyss v. Wyss* (1982), 3 Ohio App.3d 412, 416, 445 N.E.2d 1153. See, also, *Rohrbaugh v. Rohrbaugh* (2000), 136 Ohio App.3d 599, 604-05, 737 N.E.2d 551; *Lindman v. Geissler*, 171 Ohio App.3d 650, 2007-Ohio-2003, 872 N.E.2d 356, ¶33. However, R.C. 3109.04(E)(1)(a) does not require that the change be "substantial," nor does "'the change \* \* \* have to be quantitatively large, but rather, must have a material

- 6 -

effect on the child.'" *Davis*, 77 Ohio St.3d at 417-18; *McLaughlin v. McLaughlin-Breznenick*, 3d Dist. No. 8-06-06, 2007-Ohio-1087, ¶16, citing *In re Tolbert v. McDonald*, 3d Dist. No. 1-05-47, 2006-Ohio-2377, ¶31, citing *Green v. Green,* 3d Dist. No. 14-03-29, 2004-Ohio-185, ¶7. As the Court in *Davis* noted, R.C. 3109.04(E)(1)(a)'s "change of circumstances" requirement furthers the statute's:

> **\* \* \* clear intent \* \* \* to spare children from a constant tug of war between their parents who would file a motion for change of custody each time the parent out of custody thought he or she could provide the children a 'better' environment. The statute is an attempt to provide some stability to the custodial status of the children, even though the parent out of custody may be able to prove that he or she can provide a better environment.**

77 Ohio St.3d at 418, quoting *Wyss*, 3 Ohio App.3d at 416. Likewise, it has been noted that "'[t]he purpose of requiring a finding of a change in circumstances is to prevent a constant relitigation of issues that have already been determined by the trial court.'" *Saal v. Saal* (2001), 146 Ohio App.3d 579, 582, 767 N.E.2d 750, quoting *Zinnecker v. Zinnecker* (1999), 133 Ohio App.3d 378, 383, 728 N.E.2d 38.

{¶14} "In determining whether a change in circumstances has occurred, a trial judge, as the trier of fact, must be given wide latitude to consider all issues concerning a potential change." *Duer v. Moonshower*, 3d Dist. No. 15-03-15, 2004-Ohio-4025, ¶15, citing *Davis*, 77 Ohio St.3d at 416-17. "If competent, credible evidence supports the trial court's findings, its decision will not be reversed on appeal as being against the manifest weight of the evidence." Id.,

citing *Hoitt v. Siefer* (1995), 105 Ohio App.3d 104, 107, 663 N.E.2d 717. "Additionally, in custody modification cases, an appellate court must give the trial court the 'utmost respect' because it has the best opportunity to gauge the credibility, attitude, and demeanor of each witness." Id., citing *Miller v. Miller* (1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846, and *Davis*, 77 Ohio St.3d at 418. Consequently, "[a] trial court ruling concerning a modification of parental rights should not be overturned absent an abuse of discretion." *Fox*, 2004-Ohio-3344, at ¶36, citing *Masters v. Masters* (1994), 69 Ohio St.3d 83, 85, 630 N.E.2d 665. An abuse of discretion suggests the trial court's decision is unreasonable or unconscionable. *Blakemore v. Blakemore* (1983) 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

{¶15} In its judgment entry, the trial court stated as follows:

**There have been changes regarding the minor child and residential parent due to time and relocation and the Court does find that these have had a material adverse effect upon the child. The Court further finds there has been a change in circumstances that warrants a change in residential parent from Mother to Father.**

(Jan. 13, 2010 JE at 4-5).

{¶16} On appeal, Bobbie Jo argues that the trial court erred and abused its discretion in finding that a change in circumstances had occurred because its finding was based on Bobbie Jo's relocation to North Carolina, which she claims, by itself, is not sufficient to justify finding a change in circumstances.

{¶17} This Court has previously recognized that "the relocation of the residential parent alone is not sufficient to constitute a change in circumstances." *Long v. Long*, 3d Dist. No. 14-10-01, 2010-Ohio-4817, ¶30. See, also, *Eaches v. Eaches* (July 3, 1997), 3d Dist No. 8-97-05, at *3; *Thatcher v. Thatcher* (Oct. 6, 1997), 3d Dist. No. 10-97-08, at *2; *Heitkamp v. Heitkamp*, 3d Dist. No. 10-01-03, 2001-Ohio-2131. However, while relocation alone is insufficient to justify finding a change in circumstances, "[a] court may consider the fact that a relocation of the child would remove him or her from a supportive network of family and friends as a factor in finding that a change of circumstances has occurred after the custodial parent expresses a desire to move to another state." *In re Longwell* (Aug. 30, 1995), 9th Dist. Nos. 94 CA 006006, 94 CA 006007, at *8. See, also, *Green v. Green* (Mar. 31, 1998), 11th Dist. No. 96-L-145, at *3 ("[a]lthough a relocation by itself, is not sufficient to be considered a change of circumstances, it is certainly a factor in such a determination. In addition, the attendant circumstances, as well as the impact of such a move, can be considered by the court by [sic] determining if a change of circumstances has occurred."); *In re R.N.*, 8th Dist. No. 87027, 2006-Ohio-4266, ¶¶9-15 (finding that the mother's relocation to another state would not constitute a slight or inconsequential move; rather, the mother's relocation would result in the child receiving less contact with both his biological father and his extended family, and would result in a move to an area where the child had no

extended family). We note that recently this Court upheld a finding of a change in circumstances where the mother had relocated to Michigan with the parties' minor child, but the magistrate indicated that the relocation had disrupted the familial relationships that the seven-year-old child had known since birth. *Long*, 2010-Ohio-4817, at ¶32. After reviewing the record, we disagree with Bobbie Jo that the trial court's change in circumstances finding was based solely on her relocation to North Carolina.

{¶18} Here, while the trial court listed "relocation" as one of the two changes that warranted a finding of a change in circumstances, its decision was based on more than just Bobbie Jo's physical relocation to North Carolina. The trial court additionally found that "[b]oth Brooklyn and Owen have spent a substantial portion of their lives in paternal grandmother's home while both father and mother were absent. Paternal grandmother and step-grandfather have played a significant role in raising both Brooklyn and Owen and continued to do same until Mother moved to North Carolina in August 2009." (Jan. 13, 2010 JE at 2). Moreover, the trial court noted that "[b]oth Father and Mother have extended family in the Marion, Ohio area and both children enjoyed spending time with both parents' families while living in Marion and now during visits." (Id.). Furthermore, with respect to Bobbie Jo's relocation to North Carolina, the trial court stated that, "Mother currently resided with the two children as her husband is

- 10 -

deployed, and there are no family members residing in the area, although there is an expectation that some will move there in the near future." (Id. at 2-3). Therefore, it is clear that the trial court's finding was based on several attendant circumstances surrounding Bobbie Jo's relocation to North Carolina, and after reviewing the record, we believe its decision was supported by competent, credible evidence.

{¶19} Evidence at the hearing demonstrated that Brooklyn and Owen had spent a substantial amount of time with Kenneth's mother and step-father, Elizabeth Ann and Wendell Malone, and that they played a significant role in raising the children prior to them leaving for North Carolina. Elizabeth Malone testified that soon after Brooklyn was born, Bobbie Jo, Kenneth, and Brooklyn came to live with her and that for a majority amount of the time, everyone had lived with her at her house. (Dec. 17, 2009 Tr. at 141). Elizabeth explained that Bobbie Jo eventually moved into her own apartment in October of 2008, but contrary to Bobbie Jo's claims that she had taken both children to live with her, Elizabeth said that Bobbie Jo only took Owen and that Brooklyn continued to live with Elizabeth at her house. (Id.). Even though Bobbie Jo had taken Owen with her, Elizabeth said she would regularly watch Owen, and in fact, because of some difficulties between herself and Bobbie Jo with scheduling, Elizabeth testified that she had kept a calendar and had marked the days that she had watched Owen. (Id.

at 147-58); (Defendant's Ex. 3). When asked why she did not similarly keep a calendar with respect to Brooklyn, Elizabeth replied, "[because] Brooklyn was always with us." (Id. at 157). In fact, despite Bobbie Jo's separate living arrangements, prior to Bobbie Jo's relocation to North Carolina with the children, Elizabeth said that she believed Kenneth, her husband Wendell, Brooklyn and Owen had all been living at her house. (Id.).

**{¶20}** Additionally, Elizabeth explained that everybody in the household took care of the children. (Id. at 170). Normally, she would put the children to bed, while Wendell usually helped Brooklyn with her homework, and Kenneth would take Brooklyn to school, to the library, and to gymnastics. (Id. at 210, 206, 236). She said that at her house the children shared a bedroom, but had their own beds, dressers, closets, and "loads of toys." (Id. at 164).

**{¶21}** There was also evidence that Brooklyn's extended family, both maternal and paternal, were important in providing care for Brooklyn. All of Brooklyn's extended family lived around the Marion county area. Elizabeth testified that Brooklyn's maternal grandmother, Justina Arnett, would keep her overnight and take her to Moose dinners occasionally. (Id. at 171). Justina also testified that she frequently saw the children and would buy the children clothes, diapers, or "just anything they needed." (Id. at 320). Barry Johnson, who had been Justina's fiancé for the last ten years, said that it was not unusual for the

children to come over to their house to eat. (Id. at 310). Barry explained, "we all love the kids. We all try to share, you know, equal time with 'em." (Id. at 313). Brooklyn's maternal great-grandmother, Joanne Arnett, also acknowledged that the children had stayed the night at her house as well. (Id. at 337). Joanne testified that she got along with Elizabeth and Wendell and believed that the two extended families had done a pretty good job of raising the children so far. (Id. at 345).

{¶22} Finally, there was also evidence concerning Bobbie Jo's marriage and her sudden relocation to North Carolina. As part of her investigation, the investigator, Stephanie Kreisher, met with Kenneth and Bobbie Jo, performed home studies at both parents' residences, and performed a child assessment with both parents. (Dec. 17, 2009 Tr. at 38-40). At the conclusion of her investigation, Ms. Kreisher prepared a report in which she ultimately recommended that Kenneth be designated the residential parent of Brooklyn. (Dec. 17, 2009 Tr. at 40); (Court's Ex. 1). At the hearing, Ms. Kreisher stated that her recommendation had been mostly based on her contact with the parties and on her assessment of Brooklyn; however, in her report and at the hearing, Ms. Kreisher stated that she had concerns regarding Bobbie Jo's marriage and move to North Carolina. (Id. at 40, 46); (Court's Ex. 1). She explained that Bobbie Jo had informed her that she had met her husband over the internet, had only known him for a "brief period of

time," and had only had a few "actual face to face contacts before, in fact, getting married." (Id. at 47). Moreover, Ms. Kreisher said that the children had not had a lot of contact with her husband prior to the marriage, but that as a result of the marriage, because her husband was in the military, Bobbie Jo took the children with her to North Carolina. (Id.) As Ms. Kreisher explained, "we're not talking about moving a county away, we're talking about moving states away." (Id.). Additionally, Ms. Kreisher stated they knew no one in North Carolina besides Bobbie Jo's husband, whom Ms. Kreisher said would be deploying overseas soon. (Id. at 48). Further, Ms. Kreisher said that she was not aware of any other support system in North Carolina for Bobbie Jo and Brooklyn, and in fact, was told by Bobbie Jo and her husband that where they were living was a "great town for bachelors; not a great town for families." (Id. at 49).

{¶23} Along with her concerns regarding Bobbie Jo's marriage, Ms. Kreisher further stated that the relocation was significant since, prior to moving to North Carolina, both of the parties' extended families played an important role in providing the parties' child care and support. (Id. at 68-69). Ms. Kreisher said that she believed that it was Kenneth, Kenneth's mother and stepfather (whom Kenneth lived with), and Kenneth's sister, that were watching the children while Bobbie Jo was working. (Id. at 70-71). With respect to the care and support of Brooklyn, Ms. Kreisher stated, "I think that they were sharing the responsibility of

caring for this child. I think there was a period of time where the father was not in the home, there was a period of time when the mother was living in the home and the father was not there, the mother was living in the grandparent's home." (Id. at 68-69). Ms. Kreisher testified that when Bobbie Jo took the children with her to North Carolina, "she took them away from everything that was comfortable and familiar to them. She took them away from their father, she took them away from both sides – both extended families that they had had contact with prior to going." (Id. at 47). Overall, Ms. Kreisher concluded by saying that "this was a very short relationship, one that the children were not really a part of, and that the children had been taken away from all of their extended family and everything that they knew to be familiar to them." (Id. at 80).

{¶24} Based on the above, we disagree with Bobbie Jo that the trial court's finding that a change in circumstances had occurred was solely based on her relocation to North Carolina. There were several other factors that were related to Bobbie Jo's relocation to North Carolina which the trial court considered in making its determination that a change in circumstances had occurred and that the changes had had an adverse effect upon Brooklyn. These factors included the extensive and significant involvement of Brooklyn's paternal grandparents in her upbringing, Brooklyn's close relationship to both parties' extended families, and

the sudden relocation to another state in which Brooklyn was taken away from the only environment she had known.

**{¶25}** Nevertheless, in addition to finding that there had been a change in circumstances due to "relocation," the trial court also found that there had been a change in circumstance due to "time." (Jan. 13, 2010 JE at 4). Bobbie Jo similarly argues that passage of time alone is also insufficient to justify finding a change in circumstances. However, not only did the trial court consider this factor of time *in combination with* the relocation factors, but this Court has recently noted that the passage of time during a significant developmental portion of a child's life, combined with other pertinent factors, may support a trial court's finding of a change of circumstances, requiring further inquiry into the best interest of the child by a trial court. *Dodson v. Bullinger*, 3d Dist. No. 15-10-06, 2010-Ohio-6263, ¶21, citing *In re Tolbert*, 2006-Ohio-2377, at ¶32; *Butler v. Butler* (1995), 107 Ohio App.3d 633, 637, 669 N.E.2d 291 (reasoning that the passage of time during which a child progresses from infant to school age qualifies as a change in circumstances when viewed in light of other factors).

**{¶26}** Here, Brooklyn was two-years-old when the parties' entered into their first parenting agreement, which was in 2005 and which designated Bobbie Jo as the residential parent of Brooklyn. When Kenneth filed his motion for reallocation of parental rights and responsibilities in 2009, Brooklyn was six-

years-old and was attending school. Even though only four years had passed since the original parenting agreement, we believe a child at six years of age is certainly going through a significant developmental point in their life, and we believe that this factor, along with the other pertinent factors, such as the abrupt relocation to another state which took the child away from her only known support system, certainly supports the trial court's finding that a change in circumstances had occurred. See *Boone v. Kaser* (Aug. 28, 2001), 5th Dist. No. 2001AP050050, at *2. Accordingly, we find that the trial court did not err or abuse its discretion.

{¶27} Bobbie Jo's first assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FINDING IT WAS IN THE CHILD'S BEST INTEREST TO REALLOCATE THE PARENTAL RIGHTS AND RESPONSIBILITIES FOR HER CARE AND CUSTODY.**

{¶28} In her second assignment of error, Bobbie Jo argues that the trial court erred and abused its discretion in determining that it was in the child's best interest to reallocate the parental rights and responsibilities and name Kenneth the child's residential parent. In particular, Bobbie Jo claims that the trial court failed to consider the relevant statutory factors and that when one does consider the relevant statutory factors, she claims that it is clear that modifying custody was not in the child's best interest.

**{¶29}** Once the trial court has made the threshold finding that there has been a change in circumstances, the court must then make a finding as to the best interest of the child. In making this determination, R.C. 3109.04(F)(1) directs the court to consider all relevant factors, including those factors set forth in R.C. 3109.04(F)(1)(a)-(j) listed below.

> **(F)(1) In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:**
>
> **(a)    The wishes of the child's parents regarding the child's care;**
> **(b)    If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;**
> **(c)    The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;**
> **(d)    The child's adjustment to the child's home, school, and community;**
> **(e)    The mental and physical health of all persons involved in the situation;**
> **(f)    The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;**
> **(g)    Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;**
> **(h)    Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty**

**to any criminal offense involving any act that resulted in a child being an abused child or a neglected child * * ***
**(i)	Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;**
**(j)	Whether either parent has established a residence, or is planning to establish a residence, outside this state.**

R.C. 3109.04(F)(1).

{¶30} With respect to this assignment of error, Bobbie Jo argues that the trial court failed to consider all of the relevant statutory factors enumerated in R.C. 3109.04(F)(1)(a)-(j).	However, this Court has previously held that although the trial court must consider all the relevant factors, there is no requirement that the trial court set out an analysis for each of the factors in its judgment entry, "'so long as the judgment entry is supported by some competent, credible evidence.'" *Portentoso v. Portentoso*, 3d Dist. No. 13-07-03, 2007-Ohio-5770, ¶22, quoting *Bunten v. Bunten* (1998), 126 Ohio App.3d 443, 447, 710 N.E.2d 757, citing *Masitto v. Masitto* (1986), 22 Ohio St.3d 63, 488 N.E.2d 857.  See, also, *Dodson*, 2010-Ohio-6263, at ¶34.

{¶31} Next, Bobbie Jo sets forth a number of facts which she contends the trial court did not consider in reaching its determination that it was in Brooklyn's best interest to award custody to Kenneth.  For example, Bobbie Jo argues that the trial court failed to consider the fact that Brooklyn had adjusted to her new home in North Carolina and was excelling in school.  Moreover, Bobbie Jo claims that

the trial court failed to consider the fact that Kenneth had failed to pay child support to Bobbie Jo and, as a result, was subsequently charged with criminal non-support, although Bobbie Jo later agreed to forgive the arrearages owed by Kenneth. And finally, Bobbie Jo argues that the trial court failed to consider evidence that Kenneth had two prior felony convictions and several misdemeanor convictions, including domestic violence and aggravated menacing charges involving Bobbie Jo as the victim.

{¶32} However, as we stated above, the trial court is not required to mention each and every fact in support of its decision, and absent evidence to the contrary, an appellate court will presume the trial court considered all of the relevant "best interest" factors listed in R.C. 3109.04(F)(1). *Goodman v. Goodman*, 3d Dist. No. 9-04-37, 2005-Ohio-1091, ¶18, citing *Kauble v. Pfeiffer*, 3d Dist. No. 9-03-36, 2003-Ohio-6988, ¶17, citing *Mollica v. Mollica*, 9th Dist. No. 02CA0079-M, 2003-Ohio-3921, ¶11. In this particular case, there is nothing in the record to suggest that the trial court did not consider all of the relevant statutory factors. In fact, the record indicates that the trial court considered multiple relevant statutory factors in determining that it was within Brooklyn's best interest to have Kenneth be named her residential parent. Furthermore, we find that the record clearly supports the trial court's findings.

{¶33} In making its best interest determination, it is apparent that the trial court significantly relied on "the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest" pursuant to R.C. 3109.04(F)(1)(c). As we noted above, the trial court found that Brooklyn had spent a substantial portion of her time with her paternal grandparents; that the paternal grandparents had played a significant role in raising Brooklyn; and that Brooklyn had a close relationship with both extended families. (Jan. 13, 2010 JE at 2-3). However, the trial court also found that Elizabeth, Kenneth's mother, had been "the primary caregiver for both children even when Father was in the home, and Mother would leave both children with her for extended periods without contact," and after reviewing the record, we find that its finding was supported by competent, credible evidence. (Id. at 2).

{¶34} Amanda Burgett, a neighbor of Elizabeth and Kenneth's for about a year and a half, testified that Brooklyn and her daughter were best friends. (Dec. 17, 2009 Tr. at 8). Amanda said that Brooklyn and her daughter were "always together" and were playing at either her house or Elizabeth and Kenneth's house. (Id. at 9). There was even a period of time when Amanda said that she would take Brooklyn to school along with her daughter, and that while Kenneth would come by a few times to pick up Brooklyn, it was usually Elizabeth who picked up Brooklyn or dropped her off at her house. (Id. 11-12). Overall, based on her

interactions and observations, Amanda believed that Elizabeth had been Brooklyn's primary caregiver. (Id. at 20).

**{¶35}** Lisa Shade, a different neighbor of Elizabeth and Kenneth's from January 2009 until October 2009, also testified that her daughter often played with Brooklyn. (Id. at 24-25). Lisa also believed that based on her observations and interactions that Elizabeth had been Brooklyn's primary caregiver. (Id. at 29).

**{¶36}** Elizabeth additionally testified that she had been the primary caregiver for Brooklyn and Owen for the majority amount of time. (Id. at 202). Wendell similarly testified that he believed Elizabeth was the children's primary caregiver, except for when she was at work then he believed that Kenneth was the primary caregiver. (Id. at 217). According to Wendell's testimony, Brooklyn had always lived with them. (Id. at 211).

**{¶37}** Additionally, Judith Patterson, Elizabeth's daughter and Kenneth's sister, testified that Brooklyn and Owen had lived with her mother and brother prior to them leaving for North Carolina. (Id. at 112). Judith explained that at her mother's house, the children had a bedroom with their own beds, a large television, a computer, their own dressers, closets, as well as clothing and toys. (Id. at 113, 164, 213).

**{¶38}** Also, in making its determination, it is clear that the trial court relied on the Family Court's investigator's assessment and recommendation:

> **The Family Court Services Coordinator conducted an interview of both parents and Brooklyn, along with a home study of both parents' residences. Her recommendation was based in part upon Brooklyn's wishes, her relationship with both parents and their families, and her performance at school. The recommendation of the Family Court Services Coordinator is that Father be designated residential parent of Brooklyn Brammer, and that Mother exercise parenting time in accordance with the current parenting time schedule in the Temporary Order of September 4, 2009, presently assigned to Father.**

(Jan. 13, 2010 JE at 3-4). The record illustrates that Brooklyn had indicated to Ms. Kreisher that she had been living with her father and grandmother, Elizabeth, and not her mother, prior to moving to North Carolina. Ms. Kreisher testified that Brooklyn "indicated she saw her [mother] maybe a couple of times a week, but did not spend the night with her." (Dec. 17, 2009 Tr. at 42). In addition, Ms. Kreisher said that Brooklyn went into great detail about her time spent with her father and grandmother. (Id. at 91). Furthermore, Ms. Kreisher explained why she believed Brooklyn's version of events:

> **One of the things too with this child that I felt lent credibility to what was happening in the situation is that we did the assessment in the child's bedroom at the father and grandparent's home and she, you know, had just arrived from being with mother and we went into the bedroom and she walked around the room and said, 'let me show you this, let me show you this, let me tell you when I got this,' you know, all these different things. So to me that lent a great deal of credibility to the fact that this child has spent very – you know, a significant portion of her time because of looking at different things, talking about different things, where they had gone, what they had done, all of those types of things.**

(Id. at 92).

**{¶39}** This Court has previously held that it is permissible for a trial court to rely on an investigator's assessments and recommendations so long as the report contained sufficient facts from which the trial court could draw a proper conclusion and the trial court did not rely exclusively on the report in reaching its conclusion. *Martin v. Martin*, 3d Dist. No. 9-03-47, 2004-Ohio-807, ¶¶15-20. Here, the investigator's report contained numerous facts, all of which are supported by the record. Furthermore, it is clear from the trial court's judgment entry that it did not solely rely on the investigator's report in making its best interest determination. Therefore, we find that it was proper for the trial court to utilize and cite to the investigator's report and testimony in support of its decision.

**{¶40}** In addition, the trial court also considered relevant the factor listed in R.C. 3109.04(F)(1)(f), which concerns "the parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights." The trial court specifically noted that "[s]ince the date of the Temporary Order filed on September 4, 2009, difficulties have arisen involving timely exchanges of the children between the parties. Mother did not notify the Court of her intent to relocate with the children to North Carolina prior to doing so, and does not recognize the importance of timeliness and consistency in parenting time

exchanges." (Jan. 13, 2010 JE at 3). Again, we find that the trial court's finding is supported by competent, credible evidence.

{¶41} First of all, despite Bobbie Jo's claims to the contrary, there is nothing in the record that indicates she provided the court with notification of her intent to relocate with the children to North Carolina prior to doing so. In fact, the only notification in the record is a copy of the note written by Bobbie Jo to Kenneth informing him of her decision to take the children with her to North Carolina, which Kenneth attached to his motion for reallocation of parental rights. Furthermore, contrary to Bobbie Jo's assertions, there was testimony from several witnesses that there had been problems with visitation since Bobbie Jo had taken the children to North Carolina. Elizabeth testified that visitation had been a "nightmare" since Bobbie Jo moved to North Carolina. (Dec. 17, 2009 Tr. at 177-79). Additionally, Kenneth testified that visitation since Bobbie Jo had moved to North Carolina was not going very well. (Id. at 245). Kenneth said that for their first court ordered visitation with the children, Bobbie Jo had brought the kids late and that he had to give them back a day earlier than arranged. (Id. at 246-47). Then with respect to Thanksgiving weekend, Kenneth said that he was supposed to get the children the day before Thanksgiving, but that Bobbie Jo refused to bring the kids in the morning and instead told him that they would be there in the afternoon. (Id. at 247). On the day of the scheduled visitation, Kenneth said that

Bobbie Jo later texted him and informed him that if he wanted to have the children then he needed to drive over to Bucyrus, which was over an hour away, and pick them up himself. (Id.). Bobbie Jo herself acknowledged that there had been some problems with respect to Thanksgiving weekend, but she testified that it had been because she had misinterpreted the court order and thought that Kenneth did not get the children until Thanksgiving day, rather than the day before Thanksgiving. (Id. at 394-95).

{¶42} Even Ms. Kreisher said that there had been problems with Bobbie Jo bringing the kids on time to Kenneth and Elizabeth's house on the day that she was supposed to do her home assessment with the children. (Id. at 43). Despite Ms. Kreisher having called Bobbie Jo the day before to establish a time when the children would be arriving at Kenneth and Elizabeth's house, Ms. Kreisher said that when she arrived at the house the children were not there and it was "probably an hour or so later" until they actually arrived. (Id.). Therefore, even though Bobbie Jo claims on appeal that there had been no significant problems with respect to visitation and parenting time, the trial court clearly did not believe her assertions, which was within its discretion, and since there is some competent, credible evidence to support its finding, we do not find an abuse of discretion.

{¶43} Finally, while Bobbie Jo claims that Brooklyn primarily lived with her, even though the trial court found that Elizabeth had been the children's

primary caregiver, the trial court noted that it had concerns with respect to the reliability of Bobbie Jo's testimony:

> **Mother admitted that Kenneth Brammer was not the father of Owen Brammer and indicated that she believed this to be the case at the time she acknowledged in her parentage affidavit that he was the father. The issue of parentage was not presented by Mother until after the current action was filed by Father, and Mother has continued to allow Kenneth Brammer and her son Owen believe [sic] he was his father, along with the obvious fraud she has committed on the Court in her affidavit.**

(Jan. 13, 2010 JE at 3). At the hearing, Bobbie Jo testified that Kenneth Hilton was actually Owen's biological father. (Dec. 17, 2009 Tr. at 359). Bobbie Jo explained, "[w]e knew from Day 1 that Kenneth Hilton was the biological father." (Id. at 397). Despite knowing that Kenneth Hilton was Owen's biological father, Bobbie Jo admitted that she still signed an affidavit on May 15, 2008, stating that Kenneth Brammer was Owen's biological father and that she later filed a complaint also stating that Kenneth Brammer was Owen's biological father. (Id.).

{¶44} Again, the weight to be given to the evidence and credibility of the witnesses is primarily reserved to the trier of fact since they are in the best position "to view the witnesses and observe their demeanor, gestures, and voice inflections." *Barkley v. Barkley* (1997), 119 Ohio App.3d 155, 159, 694 N.E.2d 989, citing *In re Jane Doe I* (1991), 57 Ohio St.3d 135, 566 N.E.2d 1181. In this particular case, the trial court specifically mentioned in its judgment entry that it had concerns with respect to the reliability of Bobbie Jo's testimony, and we will

not second-guess the trial court's conclusion given the above evidence and the fact that weighing the credibility of Bobbie Jo's testimony was certainly within the trial court's discretion.

{¶45} Overall, in reviewing a trial court's decision to modify custody, our role is not one of a fact finder; we do not weigh the evidence nor judge the credibility of witnesses. Instead, our role is to determine whether there is relevant, competent, credible evidence upon which the fact finder could base his or her judgment. Here, our review of the record does not indicate that the trial court failed to consider the relevant statutory "best interest factors" or that reversal of the change in residential parent status under these circumstances is warranted since the trial court's decision was supported by competent, credible evidence. Therefore, we find that the trial court did not err or abuse its discretion.

{¶46} Bobbie Jo's second assignment of error is, therefore, overruled.

{¶47} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, J., concurs.**

**WILLAMOWSKI, J., concurs separately.**

{¶48} I concur with the judgment of the majority in finding that it would be in Brooklyn's best interest to change custody to Kenneth. I agree that since

Brooklyn had basically lived with her father at her paternal grandmother's house, even though Bobbie Jo was designated the residential parent, the trial court did not abuse its discretion in granting the motion to modify parental rights. The trial court specifically found that Elizabeth, the paternal grandmother, had been the primary caregiver of Brooklyn while both parents were absent. Kenneth helped out when he was home, but left most of the parenting to Elizabeth. Bobbie Jo spent time with Brooklyn, but left Brooklyn with Elizabeth for extended periods of time without contact. In addition, the Family Court Services Coordinator provided evidence that prior to the move to North Carolina, Brooklyn saw her mother a couple times a week, but did not spend the night with her. Basically, Elizabeth was acting as the parent of this child and the trial court did not act unreasonably in giving custody to Kenneth, who resides with Elizabeth.

{¶49} I am writing separately to note that in actuality, the trial court gave custody to the grandmother through the father. Specifically, the trial court granted custody to Kenneth "provided he continues to reside with his mother, Elizabeth * * *." Jan. 13, 2010, J.E. 5. If Kenneth moves out of his mother's home, the trial court will reconsider its modification and potentially return the child to Bobbie Jo. The effect of this is to grant custody of Brooklyn to Elizabeth. Although a trial court may grant custody of a child to a third party, it must first make a finding that the parents are unfit. This was not done here. The failure to do so would usually

- 29 -

result in a reversal of the trial court's judgment. However, since the trial court did not technically give custody to Elizabeth, the requirement of the finding is not triggered and the absence of such a finding is not cause for reversal. Additionally, as noted above, the trial court's judgment is supported by competent and credible evidence. For this reason, I concur in the judgment of the majority.