[Cite as *In re B.N.R.*, 2020-Ohio-2852.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

IN RE: B.N.R.

           :

           :

           :     Appellate Case No. 28662

           :

           :     Trial Court Case No. 2017-99

           :

           :     (Appeal from Common Pleas

           :     Court – Juvenile Division)

           :

           :

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of May, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JAMIE J. RIZZO, Atty. Reg. No. 0099218, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for MCCS

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, P.O. Box 240214, Beavercreek, Ohio 45434
      Attorney for Mother

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Mother appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which terminated her parental rights and granted permanent custody of her daughter, B.N.R., to Montgomery County Department of Job and Family Services - Children Services Division ("MCCS"). For the following reasons, the trial court's judgment will be affirmed.

## I. Factual and Procedural History

{¶ 2} B.N.R. was born prematurely in November 2013. At birth, B.N.R. was diagnosed with Short Gut Syndrome and required feeding through a gastrostomy tube ("G-tube"). B.N.R. also had several other medical conditions.

{¶ 3} On January 6, 2017, when B.N.R. was three years old, MCCS filed a neglect and dependency complaint regarding B.N.R. and sought interim temporary custody of her. The affidavit accompanying MCCS's motion for interim temporary custody indicated that B.N.R. was admitted to the hospital on December 30, 2016, and she had previously been admitted several times in 2016 due to failure to thrive. Each time B.N.R. was readmitted, she weighed less than what she had weighed when she was previously released from the hospital. Between December 30, 2016 and January 6, 2017, B.N.R. gained two pounds at the hospital. Hospital staff had expressed concern that B.N.R. should not be released to Mother's care again due to Mother's apparent inability to provide adequate nourishment at home. The affidavit noted that Mother had three older children, who appeared to be receiving appropriate care. MCCS had been involved with the family since 2012. Mother had not identified any relative who could care for B.N.R.

{¶ 4} It appears the court granted the ex parte motion, and after a hearing on

January 9 at which Mother appeared, the court granted interim temporary custody to MCCS. The trial court appointed a guardian ad litem ("GAL"), and a case plan was prepared. The case plan required Mother to participate in mental health and substance abuse treatment, maintain safe and stable housing, participate in medical appointments for B.N.R., attend regular visitation, submit to random drug screens, sign releases of information, and allow home visits by her caseworker.

{¶ 5} A magistrate conducted an adjudicatory/dispositional hearing on March 17, 2017, at which Mother, her attorney, the GAL, and the caseworker were present. The GAL's report recommended temporary custody to MCCS. The same day as the hearing, the magistrate adjudicated B.N.R. dependent and neglected, and it granted temporary custody to MCCS. The order included that, due to Mother's "reported bad behavior at the child's doctor appointments," Mother was not permitted to attend B.N.R.'s doctor appointments. The trial court adopted the magistrate's decision.

{¶ 6} Temporary custody was due to expire on January 7, 2018. On November 29, 2017, MCCS filed a motion for a first extension of temporary custody. The accompanying affidavit indicated that Mother was making "minimal progress on her case plan" and that B.N.R. was doing "very well" in her foster placement. On December 13, 2017, after a hearing, the magistrate granted the motion for a first extension of temporary custody to MCCS; the trial court adopted that decision. Mother's case plan was modified to include requirements concerning anger management, her communication with the foster parents, specific housing requirements for her children, and attendance at medical appointments.

{¶ 7} The first extension of temporary custody was due to expire on July 9, 2018.

On May 9, 2018, MCCS moved for a second extension of temporary custody. MCCS noted that Mother had made additional progress on her case plan objectives since the first extension of temporary custody was granted. That progress related to housing, participation in alcohol and drug treatment, and completion of a chemical dependency education program. However, MCCS also noted continuing issues with angry outbursts and aggressive behavior with MCCS staff and the foster parents. Mother had also missed six of 17 scheduled visits with B.N.R. An MCCS caseworker described B.N.R.'s ongoing medical issues and the progress she had made both medically and socially. The magistrate conducted a hearing on July 6, 2018, after which the magistrate granted the second extension of temporary custody.[1] The trial court adopted the decision.

{¶ 8} On December 7, 2018, MCCS moved for permanent custody of B.N.R. The magistrate conducted a hearing on the motion on April 16, 2019. One of B.N.R.'s foster parents, a former caseworker for Mother, and Mother's current case worker testified on behalf of MCCS. Mother testified on her own behalf. The GAL submitted a written report and orally recommended permanent custody to MCCS.

{¶ 9} On April 18, 2019, the magistrate granted permanent custody of B.N.R. to MCCS. After making extensive factual findings, the magistrate reached the following conclusions:

1. In accordance with [R.C.] 2151.414(E), there is clear and convincing evidence that the child cannot and should not be placed with the mother in a reasonable time. The mother was not able to address the child's

---

[1] This hearing also involved a dependency and neglect complaint concerning another daughter of Mother, H.R, who was born in May 2011. The magistrate granted MCCS temporary custody of H.R. at that time. H.R. was placed with B.N.R.'s foster parents.

significant medical issues and specifically, the child's nutritional issues. The child has other significant medical issues that also need to be addressed on a consistent basis. The mother has not demonstrated that she can meet the child's basic needs and in fact, had another child subsequently removed from her care for educational neglect. That sibling did not have proper dental care and required dental surgery to correct the resulting problems. The sibling has not been returned to the mother's care. The mother has not demonstrated that she can meet this child's basic needs, let alone the child's significant special needs.

2. In accordance with [R.C.] 2151.414(D), there is clear and convincing evidence that the commitment of the child to the permanent custody of Montgomery County Children Services is in the child's best interest. The current foster family has been meeting the child's basic and special needs and has advocated for the child to obtain necessary services. The foster mother is a nurse and is in a better position to be able to meet the child's numerous special needs and to ensure the child develops to the child's full potential. The foster family has indicated a desire to adopt the child and can provide stability and appropriate care for the child. The child has been with this foster family for over two years and has bonded with the family.

{¶ 10} Mother filed timely objections to the magistrate's decision. The court subsequently granted Mother's request for a transcript and to supplement her objections. The transcript was filed on May 23, 2019. Mother filed her supplemental objections on July 22, 2019. She argued that the magistrate erred in granting MCCS permanent

custody, because there was not clear and convincing evidence that permanent custody to MCCS was in the child's best interest. Mother asserted that she had substantially completed her case plan.

{¶ 11} In an 11-page decision, the trial court reviewed the evidence from the April 16, 2019 hearing and Mother's progress on her case plan objectives. The trial court concluded that B.N.R. had been in the temporary custody of MCCS for more than 12 months of a consecutive 22-month period when MCCS filed its motion for permanent custody, that B.N.R. cannot or should not be placed with Mother within a reasonable time, that MCCS made reasonable efforts to implement the case plan, that "concerns still exist" even though Mother had completed various case plan objectives, and that permanent custody was in B.N.R.'s best interest. The trial court overruled Mother's objections, terminated Mother's parental rights, and granted permanent custody of B.N.R. to MCCS.

{¶ 12} Mother appeals from the trial court's judgment.[2]

## II. Standard for Motion for Permanent Custody

{¶ 13} The United States Supreme Court has stated that a parent's interest in the care, custody, and control of his or her children "is perhaps the oldest of the fundamental liberty interests recognized by" that court. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Unless they forfeit the right through specific conduct, "suitable" parents have a "paramount" right to the custody of their minor children. *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). Still, "the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." (Citation omitted.) *In re*

---

[2] B.N.R.'s father is unknown.

*Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 14} Because an award of permanent custody is a "drastic remedy" that involves the termination of parental rights, permanent custody determinations must be based upon clear and convincing evidence. *In re S.M.*, 2d Dist. Montgomery No. 24539, 2011-Ohio-6710, ¶ 4, fn.1, quoting *In re A.W.*, 2d Dist. Montgomery No. 21309, 2006-Ohio-2103, ¶ 6; *see also* R.C. 2151.414(B)(1) and (E). "Clear and convincing evidence" is " 'the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established.' " *In re Rose*, 2017-Ohio-694, 85 N.E.3d 498, ¶ 19 (2d Dist.), quoting *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986). "Clear and convincing" means "more than a mere preponderance," but less than "clear and unequivocal." *Id.*

{¶ 15} R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency. First, the court must find by clear and convincing evidence that the child either (a) cannot or should not be placed with either parent within a reasonable period of time; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period. *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14, citing *In re K.M.*, 8th Dist. Cuyahoga No. 98545, 2012-Ohio-6010, ¶ 8; R.C. 2151.414(B)(1). Second, the court must determine that granting permanent custody to the agency is in the child's best interest. *Id.*

{¶ 16} In determining a child's "best interest," a court must consider all relevant factors, including but not limited to:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of [an agency] * * * for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors listed at R.C. 2151.414(E)(7)-(11) apply .

R.C. 2151.414(D)(1); *see also In re A.T.*, 2d Dist. Montgomery No. 28332, 2019-Ohio-3527, ¶ 82. R.C. 2151.414(E)(7) through (11) include whether the parent has been convicted of any of a number of listed offenses; whether the parent has repeatedly withheld medical treatment or food; whether the parent has placed the child at substantial risk of harm two or more times due to substance abuse and has rejected treatment two or more times or refused to participate in treatment; whether the parent has abandoned the child; and whether the parent has had parental rights previously terminated.

{¶ 17} A trial court's decision on termination of parental rights "will not be overturned * * * if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted.) *In re L.J.*, 2d

Dist. Clark No. 2015-CA-85, 2016-Ohio-2658, ¶ 21, citing *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15.

{¶ 18} The trial court found, and Mother does not dispute, that B.N.R. had been in the temporary custody of MCCS for 12 or more months of a consecutive 22-month period preceding MCCS's motion for permanent custody, in accordance with R.C. 2151.414(B)(1)(d). The court's finding is supported by the record.[3] Accordingly, we focus on whether the trial court erred in finding that granting permanent custody to MCCS was in the best interest of B.N.R.

### III. Best Interest of B.N.R.

{¶ 19} In her sole assignment of error, Mother claims that the juvenile court erred in granting permanent custody to MCCS, because it was in B.N.R.'s best interest to be returned to Mother.

{¶ 20} The evidence at the April 16, 2019 permanent custody hearing was as follows.

{¶ 21} Rebecca Warden-Wiley, one of B.N.R.'s foster parents and a registered nurse, testified that B.N.R. was placed with her and her wife on January 12, 2017, when B.N.R. was three years old. At the time of the April 16, 2019 hearing, B.N.R. was five years old.

{¶ 22} Warden-Wiley stated that, when B.N.R. came to live with her, B.N.R. had several medical concerns, the most significant of which was feeding issues. B.N.R. had

---

[3] The trial court found, and the State argues on appeal, that B.N.R. cannot or should not be placed with Mother within a reasonable time. However, because R.C. 2151.414(B)(1)(d) applies, we need not discuss the trial court's findings under R.C. 2151.414(E)(1) and (14) that B.N.R. cannot or should not be placed with Mother within a reasonable time.

been diagnosed with Short Gut Syndrome, and she was underweight when she came into Warden-Wiley's care. B.N.R. was fed 24 hours per day by a G-tube, not by mouth, and she had severe diarrhea 10-12 times per day. At first, B.N.R. was fed a low dose of Pediasure Peptide due to her bowel problems. As she started tolerating that, the dose slowly increased. B.N.R. was also on medication for diarrhea and other gastric issues.

{¶ 23} Warden-Wiley testified that, at the time of the hearing, B.N.R. was fed by G-tube only at night, and she ate well during the day. Her favorite food was cereal. Warden-Wiley stated that the G-tube required daily care; it needed to be flushed twice per day, kept clean, and kept inaccessible from B.N.R., who would grab it and pull it out. Warden-Wiley testified that she was trained on how to reinsert a G-tube, so B.N.R. did not need to go to the emergency room to have it reinserted. B.N.R. last pulled out the G-tube about three months before the hearing. On cross-examination, Warden-Wiley stated that a lay person also could be taught to put the G-tube back in.

{¶ 24} Warden-Wiley testified that B.N.R. was legally blind with nystagmus, had issues with the muscles in her eyes, and had cataracts in one of her eyes. Initially, B.N.R. wore an eye patch over her good eye for approximately eight hours a day, and she was down to wearing it for four hours per day at the time of the hearing. B.N.R. received glasses, which she wears when she is awake, and she eventually had surgery on her right eye. B.N.R.'s vision problems were permanent, but Warden-Wiley stated that B.N.R. got around unassisted at home and school, and she had started to recognize letters, shapes, and colors. B.N.R. holds objects close to her face. On cross-examination, Warden-Wiley stated that B.N.R. previously had eye surgery in Michigan, but Warden-Wiley did not know if her eye previously had been patched.

{¶ 25} B.N.R. also received occupational therapy, physical therapy, and feeding therapy. The physical therapy was to work on gross motor skills, such as crawling, standing, and walking. The occupational therapy worked on fine motor skills, such as picking up food with her hands, feeding herself, using silverware, and coloring. When B.N.R. came into Warden-Wiley's care, she could crawl and pull herself up on the couch, but could not walk.

{¶ 26} Warden-Wiley testified that B.N.R. had made great progress regarding her mobility. B.N.R. went from crawling to using a "G-Walker," which she learned to use quickly. B.N.R. took more than a year to move from walker to walking independently, but she walked without assistance at the time of the hearing.

{¶ 27} B.N.R. saw several physicians: a neurologist, a gastrointestinal (GI) doctor, a nutritionist, an eye specialist, and a physical medicine doctor, as well as her primary care physician. Warden-Wiley stated that B.N.R. saw a neurologist once, where she was assessed for several issues, but told to follow up as needed; B.N.R. had not seen the neurologist since. B.N.R. originally saw the GI doctor every two weeks, but as of the hearing date, she saw him every six months. B.N.R. originally saw the eye doctor every four weeks, but was seeing him every three months as of the hearing date. She saw the physical medicine doctor once per year. B.N.R. received occupational, physical, and speech therapy once per week.

{¶ 28} Warden-Wiley testified that B.N.R. attended preschool from 9:00 a.m. to 12:30 p.m, on Monday through Thursday, and she attended Head Start from 1:00 p.m. to 4:30 p.m. on Monday, Tuesday, and Wednesday. B.N.R. had an Individualized Education Program (IEP), under which also she received occupational, physical, and

speech therapy at school.

{¶ 29} Warden-Wiley testified that, in the beginning, there were difficulties with her (Warden-Wiley's) interactions with Mother; Mother made negative comments about Warden-Wiley's sexuality and race and about how B.N.R. was dressed and cared for. Mother had weekly visitation with B.N.R. Mother initially attended two of B.N.R.'s medical appointments, but none after that; Warden-Wiley was told that Mother was not permitted to attend.

{¶ 30} Warden-Wiley described a typical day for B.N.R. B.N.R. usually gets up around 8:00 a.m. after she is unhooked from her feeding tube; B.N.R. sleeps in a crib due to her medical needs. She has a routine of using the bathroom first, and then she gets dressed and goes to the kitchen to select her cereal. After eating, B.N.R. gets ready for school, including getting her glasses, patch, ankle braces, shoes, and bookbag. B.N.R. takes buses to and from school and Head Start, and she does well getting off of one bus and onto another. B.N.R. arrives home around 4:45 p.m., "takes her stuff off, gets a snack, shows us her stuff from her bookbag." Warden-Wiley described B.N.R. as active and involved in the family's evening activities. The family eats dinner between 6:00 p.m. and 7:00 p.m., and B.N.R. takes a bath, which she loves, on certain days. B.N.R gets her medicine and her G-tube hooked up, and usually goes to bed around 8:00 p.m.

{¶ 31} Warden-Wiley stated that she and her wife had four other children in their home: Warden-Wiley's 11-year-old daughter, the couple's five-year-old son, B.N.R.'s seven-year-old sister (H.R.), and a boy, who was eight. B.N.R. enjoyed family outings to the creek and park and riding her adaptive tricycle. The group had taken several vacations together. Warden-Wiley stated that she loved B.N.R. like her own child, and

B.N.R. was very bonded to her, her wife, and the other children in the home. Warden-Wiley and her wife were considering adopting B.N.R. should permanent custody be granted to MCCS.

{¶ 32} Warden-Wiley expressed concern if B.N.R. were returned to Mother. Warden-Wiley explained that, when B.N.R. first came, B.N.R. "was a nonmobile, nonverbal, pretty little baby that sat there and did nothing." Warden-Wiley said that B.N.R. was now "all over the place, into everything, tells you no, spits at you" at the time of the hearing. Warden-Wiley had concerns because B.N.R. was no longer "that quiet compliant little child anymore." Warden-Wiley acknowledged that she never witnessed Mother hurt B.N.R.

{¶ 33} Lisa Brown was Mother's caseworker from January 2017 until early March 2019.[4] Brown stated that MCCS received a referral due to B.N.R.'s sixth hospitalization for failure to thrive, and the agency had concerns about B.N.R.'s multiple heath issues and her continued weight loss while in Mother's care. The agency briefly placed B.N.R. with an emergency foster placement while a suitable foster home was located. MCCS then placed B.N.R. with Warden-Wiley and her wife, Shelly Wiley, on January 12, 2017, and B.N.R. had remained in their care since then.

{¶ 34} Brown testified that B.N.R. had seven primary medical diagnoses, including quadriplegic cerebral palsy, Short Gut Syndrome, acquired hip dyplasia, legal blindness,

---

[4] On cross-examination, Brown clarified that she began working on Mother's case in January 2017, but became the primary caseworker in March 2017. Brown further testified that, in early 2018, Alicia Green also began working on the case. In August 2018, the case was "split" where Brown remained B.N.R. and H.R.'s caseworker, but Alicia Green became the caseworker for Mother. In February 2019, Green stopped working on the case, but became the caseworker again when Brown transferred the case to her on March 4, 2019.

feeding disorder, and a multiple of issues with fine and gross motor skills and developmental delays. Brown stated that B.N.R. had services to address these diagnoses. She received routine care at Dayton Children's, which monitored her weight and G-tube. B.N.R. saw an eye specialist and had had two or three eye surgeries and three pairs of glasses. She was involved in physical, occupational, eating, and speech therapy through United Rehabilitative Services (URS), and she saw a physical medicine doctor, who dealt with her braces on her legs. Brown stated that B.N.R.'s foster parents arranged for these services and ensured that B.N.R.'s needs were being met.

{¶ 35} Brown testified that a case plan was created for Mother with a goal of reunification. Mother's most recent case plan, from January 2019, required her to attend mental health, alcohol, and drug therapy, to sign releases of information, to maintain suitable adequate housing, to maintain her employment, to attend visitation with B.N.R. and her other daughter (H.R.), and to attend H.R.'s doctor appointments and appointments regarding Mother's two sons, who were living with Mother. Mother agreed to work on those plan objectives.

{¶ 36} With respect to the mental health and substance abuse objective, Brown testified that Mother had a history of treatment with DayMont Behavioral Health. She later switched to Turning Point and completed an alcohol and drug educational class there. In February 2018, Mother began treatment at Samaritan Behavioral Health with a particular therapist, whom she last saw in May 2018. In July 2018, she switched to a different therapist at Samaritan Behavioral Health, and Mother had consistently attended mental health and substance abuse treatment since then. Brown testified that this case plan objective was ongoing.

{¶ 37} Brown testified that there was a case plan objective that Mother demonstrate stable mental health and ability to converse without becoming aggressive due to Mother's history of angry outbursts with Brown, the foster parents, and treatment providers. Brown stated that Mother's behavior "waxed and it waned." Due to Mother's behavior, MCCS asked in March 2017 that Mother no longer be allowed to attend medical appointments, and the trial court made that order. Brown stated that Mother never got to the point where she was again attending doctor appointments. Brown explained that the agency was "testing out" the relationship with MCCS doing the exchanges for visitation at the agency. Brown testified on cross-examination that the exchange she saw between Mother and the foster parents on April 1, 2019 went "okay."

{¶ 38} Brown testified that Mother signed releases of information and had housing. In March 2017, Mother had to move due to problems that her landlord was having. Mother found new housing with the assistance of Homefull, and she was still living there when Brown transferred the case to another caseworker in March 2019. Brown stated that the home was safe and appropriate for the children in Mother's care, but it would not have been appropriate for B.N.R., because B.N.R. needed a crib, which Mother did not have.

{¶ 39} Mother was employed through most, but not all, of the pendency of the case. Brown stated that Mother had been in her current employment for approximately 15 months. Brown was able to verify Mother's income.

{¶ 40} Brown testified about whether Mother was meeting the needs of the children in her care, which included two sons (ages 14 and 16 at the time of the hearing) and H.R., a daughter. Brown stated that the boys' needs were being met between Mother, the

boys' father, and their grandparents. (At one point, the boys were living with their father full-time; Brown indicated that they were added to Mother's case plan in January 2019.) On cross-examination, Brown stated that there were some issues with the oldest son's being tardy getting to his classes during the school day. H.R. was removed from Mother's home in July 2018 due to educational neglect. After H.R. came into MCCS's care, H.R. had to have dental surgery due to an excessive amount of tooth decay. MCCS also learned that H.R. had several undiagnosed allergies. While Brown was Mother's caseworker, H.R. had not been returned to Mother.

{¶ 41} Brown testified that Mother originally had visitation with B.N.R. on Fridays, and, as of the hearing date, had visitation on Mondays from 5:00 p.m. to 7:00 p.m. Between January 2017 and July 2018, Mother missed 15 visits with B.N.R. Her visitation became consistent after both B.N.R. and H.R. were in MCCS's custody; since July 2018, Mother missed only the February 25, 2019 visitation. Brown stated that there were a couple of rescheduled visitations due to confusion about visitation around the holidays.

{¶ 42} Brown stated that Mother's visitation was supervised, and that she (Brown) had observed Mother's visits with B.N.R. Brown stated that Mother's visits typically centered around Mother's doing B.N.R.'s hair, and Brown encouraged Mother to do more interactive things with B.N.R. Brown told Mother that doing tactile activities, like puzzles, would be beneficial to B.N.R. Mother brought in puzzles but reverted back to doing B.N.R.'s hair.

{¶ 43} Brown indicated that Mother did not administer feedings during visitation. During one visit, something happened to make the drip number go down on B.N.R.'s feeding machine, and from that point, the foster parents arranged B.N.R.'s feedings so

that B.N.R. could be unattached to the feeding tube during visitation.

{¶ 44} Brown did not know if Mother's sons were bonded with B.N.R. Brown did not recall if Mother's oldest son had been to visitation, and recalled that the younger son had been to a few visits. Brown stated that B.N.R. was bonded to her sister, H.R., and the other children in her foster placement.

{¶ 45} Brown testified that MCCS searched for family members with whom B.N.R. could be placed and identified five potential relatives. None of the relatives expressed interest in caring for B.N.R. In January 2019, Mother identified a potential relative in Columbus. Brown believed that the caseworker who took over the case in March 2019 contacted that relative.

{¶ 46} Brown testified that MCCS had provided information referral, case management, substitute care, and transportation assistance to Mother.

{¶ 47} Brown stated that MCCS considered B.N.R. to be adoptable, and that the foster parents had indicated that they were in a position to and willing to adopt B.N.R. should the opportunity become available.

{¶ 48} Alicia Green had been the ongoing caseworker for Mother and her family since March 2019; she testified that she previously was Mother's caseworker in the summer into fall of 2018 due to communication issues between Mother and Brown. When asked about Mother's housing, Green stated that Mother no longer had independent housing. Green explained that a pipe burst in Mother's home, which caused extensive damage, and the landlord refused to fix it adequately. As a result, Mother decided to leave that residence. Green made a referral to Homefull to assist Mother with locating new housing.

{¶ 49} Green stated that Mother had income and had completed the substance abuse part of her treatment through Samaritan Behavioral Health. Mother had been visiting B.N.R.; the visitation was monitored, but not supervised.

{¶ 50} Green testified that she had observed B.N.R. with her foster parents, and B.N.R. was bonded to them. Green stated that permanent custody to MCCS was in B.N.R.'s best interest, "because she's been in care for over two years and she has the right to permanency."

{¶ 51} On March 26, 2019, Green spoke with the identified relative in Columbus regarding potential placement for B.N.R. and H.R.; the relative wanted to help Mother, but stated that she "didn't have enough time for a home study, let alone enough time to care for two more children, especially one with special needs." Green stated that she did not identify any other appropriate relatives or non-relatives that might be able to care for B.N.R.

{¶ 52} On cross-examination, Green testified that her primary goal in 2018 was to get Mother "on track on her Case Plan." Green stated that "it went pretty well," and Mother was "on task in completing her Case Plan goals," and that she was "motivated." Green believed that, at the time of the hearing, Mother was motivated but had not substantially completed her case plan due to Mother's housing situation and her need to maintain mental health treatment. Green believed Mother and B.N.R. were bonded with each other. Green did not know whether Mother had the "wherewithal" to meet B.N.R.'s current medical needs; Green stated that she had "doubts that she [Mother] would be able to maintain [B.N.R.] at the level of care that she [B.N.R.] requires." Green did not believe Mother otherwise was a risk to B.N.R. Green testified that the foster parents

would be able to meet B.N.R.'s medical needs.

**{¶ 53}** Mother testified on her own behalf. She stated that before B.N.R.'s removal, Mother made medical appointments for B.N.R. with a GI specialist at Dayton Children's and with a physician at Five Rivers. Mother sometimes was unable to get B.N.R. to her appointments due to transportation issues; Mother stated that she depended on other people to take her to the appointments. Mother testified that, later, a social worker from Dayton Children's starting scheduling appointments and provided taxi or bus fare so Mother could take B.N.R. to the appointments.

**{¶ 54}** Mother testified that she followed through with the doctors' instructions regarding B.N.R., including feeding instructions. When asked about B.N.R.'s lack of weight gain, Mother stated, "[M]aybe I was doing it wrong or * * * probably a miscommunication of how I was supposed to been mixing things up as far as the milk and the gelatin." Mother testified that she believed that she could meet B.N.R.'s needs with "help" or "services." On cross-examination, Mother acknowledged that B.N.R. had been hospitalized on several occasions in the year leading to B.N.R.'s removal from Mother's care (Mother stated that most hospital visits were due to B.N.R.'s pulling out her G-tube) and that B.N.R. lost weight between hospitalizations.

**{¶ 55}** Mother testified about her case plan progress. She stated that she had received drug treatment at DayMont for marijuana use only, and had been clean. She successfully completed probation and reengaged in mental health and substance abuse treatment at the request of MCCS. Mother stated that she continued to address her mental health needs. Mother testified that she had housing for almost two years, until a pipe incident in March 2019, and that she was trying to establish housing. She

acknowledged that it was difficult to find something suitable. At the time of the hearing, Mother had been employed full-time at Precision Manufacturing for approximately 16 months and earned $8.60 per hour. Mother previously was a home healthcare provider.

{¶ 56} Mother testified that her visits with B.N.R. "go great" and they were bonded to one another. Mother stated that since the issue of doing B.N.R.'s hair was brought to Mother's attention, they began to play, sing, read books, eat, and walk around the facility. Mother stated that the foster parents bring B.N.R. to visitation, and the exchanges have been going okay; Mother had a better rapport with Warden-Wiley's wife. Mother stated that she attended the medical appointment that was arranged for H.R., and her sons' medical needs were being met. Mother indicated that her sons' father had recently died, and one of her sons was lashing out at school. Her sons were staying with their paternal grandmother.

{¶ 57} Addressing the motion for permanent custody, Mother stated that she had made "some mistakes" concerning B.N.R.'s care, but she did not think she was a bad mother overall. Mother said that she missed B.N.R. and wanted her home; Mother thanked the foster parents for taking care of B.N.R. Mother testified that she would follow through with any additional requirements or instructions to meet B.N.R.'s needs.

{¶ 58} The trial court asked the guardian ad litem for his recommendation. The guardian ad litem recommended that permanent custody be granted to MCCS.

{¶ 59} Based on the evidence presented at the April 2019 hearing, the trial court concluded that permanent custody to MCCS was in B.N.R.'s best interest. With respect to B.N.R.'s interactions, the trial court found:

Although Mother missed 15 visits with the child between January

2017 and July 2018, the MCCS caseworker testified that she observed an affectionate bond between Mother and B.R. There were concerns raised by the Agency about Mother's lack of interactivity with the child during visits, as she mostly opted to do the child's hair during visits. Mother's visits have been consistent since July 2018.

A clear bond exists between B.R. and those in her foster home. Ms. Warden-Wiley testified extensively about the bond that she shares with the child. The child is also well integrated into the Warden-Wiley's family unit, and shares a relationship with their extended family and the other children in the foster home, including her sibling, H.R., who was also placed in the foster home following Agency removal.

The court noted that B.N.R. was removed from Mother's care on January 6, 2017, she had been in her current foster placement since January 12, 2017, and had been in MCCS's custody for 12 or more months of a consecutive 22-month period.

{¶ 60} With respect to B.N.R.'s need for a legally secure placement, the court reiterated that B.N.R. had never been returned to Mother's care, and found that since B.N.R. has been in foster care, she has been able to walk independently, eat regular food, develop a vocabulary, and has had no subsequent weight concerns. The court found that B.N.R. was thriving in foster care and noted that the Warden-Wileys had expressed interest in adopting her.

{¶ 61} The court addressed Mother's argument that she had substantially completed her case plan. While recognizing that Mother had stable employment, was engaged in mental health counseling, and was visiting with B.N.R. consistently, the court

found that Mother no longer had independent housing and there were concerns about Mother's ability to care for B.N.R.'s needs. Mother had not been involved in B.N.R.'s medical care since her removal. The court further noted that Mother had another child removed from her care in July 2018 due to educational neglect, and the child, H.R., was found to have had untreated medical needs.

{¶ 62} As to the child's wishes, the trial court found that "the child was unable to adequately articulate her wishes due to her developmental delays." We note that R.C. 2151.414(D)(1)(b) "unambiguously gives the trial court the choice of considering the child's wishes directly from the child or through the guardian ad litem." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 55. Thus, "[t]he trial court has discretion to accept the testimony of the guardian ad litem on the child's wishes rather than hearing a direct expression of those wishes made by the child." *Id.* at ¶ 56. Here, the guardian ad litem filed a written report and orally recommended permanent custody to MCCS.

{¶ 63} Upon review of the record, the trial court's determination that permanent custody to MCCS was in the best interest of B.N.R. was supported by clear and convincing evidence. We find no error in the trial court's determination to grant permanent custody to MCCS.

{¶ 64} Mother's assignment of error is overruled.

**V. Conclusion**

{¶ 65} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Jamie J. Rizzo
Robert Alan Brenner
Sara M. Barry
Hon. Helen Wallace