[Cite as *Depinet v. Norville*, 2020-Ohio-3843.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## WYANDOT COUNTY

MELISSA L. DEPINET,

    PLAINTIFF-APPELLEE,

                                   CASE NO. 16-19-04

    v.

SHARON K. NORVILLE,

    DEFENDANT-APPELLANT,
    -and-                               O P I N I O N

ROBERT L. NORVILLE, JR.,

    DEFENDANT-APPELLEE.

---

**Appeal from Wyandot County Common Pleas Court**
**Juvenile Division**
**Trial Court No. G2182029**

**Judgment Affirmed**

**Date of Decision:  July 27, 2020**

---

APPEARANCES:

    *Gene P. Murray* for Appellant

    *Kelle M. Saull* for Appellee, Melissa L. Depinet

**PRESTON, J.**

{¶1} Defendant-appellant, Sharon K. Norville ("Norville"), appeals the August 22, 2019 judgment of the Wyandot County Court of Common Pleas, Juvenile Division granting plaintiff-appellee, Melissa L. Depinet ("Depinet"), legal custody of Norville's two minor daughters, B.N. (DOB: 2003) and S.N. (DOB: 2013). For the reasons that follow, we affirm.

{¶2} B.N. and S.N. are the minor daughters of Norville and Robert L. Norville, Jr. ("Robert").[1] On September 13, 2018, Depinet filed a complaint seeking legal custody of B.N. and S.N. (Doc. No. 1). That same day, Depinet filed a motion for an emergency ex parte order naming her the emergency temporary legal custodian of B.N. and S.N. (Doc. No. 2). (*See* Doc. Nos. 3, 4). Later that day, the trial court granted Depinet's motion for emergency temporary custody of B.N. and S.N. (Doc. No. 6). In its decision, the trial court granted Norville supervised visitation at Hannah's House and instructed the parties to immediately contact

---

[1] Although Robert is a party to the complaint, at the time of the final hearing he was incarcerated in a state penal institution with a sentence that was not set to expire for more than five years from the date of the final hearing. (*See* Doc. Nos. 1, 4, 39, 49, 50); (Feb. 28, 2019 Tr. at 6-7. 111). Robert failed to answer Depinet's complaint for legal custody and did not appear at any of the trial court proceedings, send a representative on his behalf, or object to the trial court's findings despite being duly served. (*See* Doc. Nos. 1, 4, 13, 15, 16, 17, 19, 22, 39, 49, 50); (Feb. 28, 2019 Tr. at 6-7). Accordingly, our analysis will focus exclusively on the trial court's findings as they relate to Norville.

Hannah's House to initiate visitation. (*Id.*). On October 10, 2018, Norville filed her answer to Depinet's complaint for legal custody. (Doc. No. 19).

{¶3} A hearing on Depinet's complaint for custody was held before a magistrate on February 28, 2019 and March 7, 2019. (Doc. Nos. 39, 49, 50). On April 5, 2019, the magistrate filed her decision recommending that Depinet be named the legal custodian of B.N. and S.N. (Doc. No. 39). On April 19, 2019, Norville filed objections to the magistrate's decision, two of which are relevant to this appeal. (Doc. No. 40). First, Norville objected to the magistrate's finding that she is an "unsuitable parent." (*Id.*). Specifically, Norville referenced Depinet's return of Norville's minor son, C.N., to Norville's care and alleged that this action resulted in the "reversible and inescapable" conclusion that Depinet "only wanted [Norville's] girls and not her boy" and violated her constitutional rights of due process and equal protection. (*Id.*). Second, Norville incorporated by reference all objections raised on her behalf at the final hearing. (*Id.*). On July 5, 2019, Depinet filed her response to Norville's objections to the magistrate's decision. (Doc. No. 48). On August 8, 2019, the trial court overruled Norville's objections and adopted the magistrate's decision. (Doc. No. 49). On August 22, 2019, the trial court filed a judgment entry granting Depinet legal custody of B.N. and S.N. (Doc. No. 50).

{¶4} On September 23, 2019, Norville filed her notice of appeal. (Doc. No. 53). She raises three assignments of error for our review. For ease of discussion,

Case No. 16-19-04

we elect to address Norville's assignments of error out of order. We will first address Norville's second assignment of error. We will then discuss Norville's first and third assignments of error together.

## Assignment of Error No. II

**The juvenile court of Wyandot County lacked jurisdiction, as there was no personal jurisdiction, nor subject matter jurisdiction ever established, nor shown in Wyandot County in this case; and accordingly, the Wyandot County Juvenile Court cannot bestow jurisdiction upon itself, when it has none, as none was shown nor established, thereby resulting in plain error.**

{¶5} In her second assignment of error, Norville argues that the Wyandot County Court of Common Pleas, Juvenile Division lacked personal jurisdiction over her and subject-matter jurisdiction. We disagree.

{¶6} First, we conclude that Norville has waived her right to challenge personal jurisdiction. "[A]n objection to personal jurisdiction is waived by a party's failure to assert a challenge to such jurisdiction at its first appearance in the case." *In re A.L.W.*, 11th Dist. Portage Nos. 2011-P-0050, 2011-P-0051 and 2011-P-0052, 2012-Ohio-1458, ¶ 37, citing *McBride v. Coble Express, Inc.*, 92 Ohio App.3d 505, 510 (3d Dist.1993). Here, the record is devoid of any evidence indicating that Norville previously asserted such a challenge. Accordingly, Norville has forfeited her right to challenge personal jurisdiction on appeal. *See In re P.O.*, 11th Dist. Geauga No. 2015-G-0028, 2015-Ohio-4774, ¶ 23 (appellant failed to challenge the juvenile court's jurisdiction over her person in a custody proceeding and therefore

-4-

"forfeited any such challenge on appeal"); *In re G.D.*, 9th Dist. Summit No. 27855, 2015-Ohio-4669, ¶ 19 (appellant waived any challenge to the trial court's personal jurisdiction in a permanent custody proceeding where the appellant "did not object to service, appeared at the permanent custody hearing, and fully participated in the hearing").

{¶7} However, "[b]ecause subject-matter jurisdiction goes to the power of the court to adjudicate the merits of a case, it can never be waived and may be challenged at any time." *Pratts v. Hurley*, 102 Ohio St.3d 81, 2004-Ohio-1980, ¶ 11, citing *United States v. Cotton*, 535 U.S. 625, 630, 122 S.Ct. 1781 (2002) and *State ex rel. Tubbs Jones v. Suster*, 84 Ohio St.3d 70, 75 (1998). "The juvenile court has jurisdiction to determine the custody of any child not a ward of another court, even though the court has not first found the child to be delinquent, neglected, or dependent." *In re Bonfield*, 97 Ohio St.3d 387, 2002-Ohio-6660, ¶ 42, citing *In re Torok*, 161 Ohio St. 585 (1954), paragraphs one and two of the syllabus. "This exclusive responsibility 'to determine the custody of any child not a ward of another court of this state' cannot be avoided merely because the petitioner is not a 'parent' under R.C. 3109.04." *Id.*, quoting R.C. 2151.23(A)(2). *See also In re J.R.A.*, 4th Dist. Washington No. 13CA18, 2014-Ohio-4463, ¶ 28 ("Nonparents can bring custodial claims for children who are not wards of another court of this state under R.C. 2151.23(A)(2)."); Juv.R. 10(A) (stating that "[a]ny person may file a complaint

to have determined the custody of a child not a ward of another court of this state");

R.C. 2151.27(D) ("Any person with standing under applicable law may file a

complaint for the determination of any other matter over which the juvenile court is

given jurisdiction by Section 2151.23 of the Revised Code."). Thus, because B.N.

and S.N. were not wards of the state, the Wyandot County Court of Common Pleas,

Juvenile Division had subject-matter jurisdiction over Depinet's complaint for

custody. *See Varney v. Allen*, 4th Dist. Ross No. 16CA3543, 2017-Ohio-1409, ¶ 17.

{¶8} Accordingly, Norville's second assignment of error is overruled.

### Assignment of Error No. I

**In an abuse of the trial court's discretion, there were denials of the fundamental and substantial rights to due process of law and of equal protection of the laws, as guaranteed by the respective namesake clauses of the Fourteenth Amendment to the Constitution of the United States, and also there was a correlative total negation of the magistrate's and trial court's decisive premise that appellant (Mother) Sharon Norville was an unsuitable (unfit) parent, for the magistrate and trial court allowed the return of the appellant's minor child, a boy, to the custody of the defendant-appellant mother, while granting the plaintiff-appellee's motion to obtain custody of the appellant's other minor children, two girls, on the untenable grounds, both figuratively and literally, that the plaintiff-appellee could not handle the boy, and so the defendant-appellant mother could have him back, and the plaintiff-appellee could keep the girls.**

### Assignment of Error No. III

**In an abuse of its discretion, the trial court reversibly erred in expressly ruling that "the court in review of the transcripts finds there were a few objections that were not decided correctly, however, these errors would not change the ultimate ruling in this**

**matter, given the weight of the admissible evidence in support of the magistrate's decision." (From page 6 in the August 8, 2019 judgment entry in the trial court) Wherefore, or wherefore art thou, objectionwise, it is respectfully submitted as an assignment of error that such a trial court ruling is prima facie inherently impossible to discern or glean appealable issues therefrom, and accordingly violates the defendant-appellant mother's fundamental and substantial right to due process of law, as guaranteed by the Fourteenth Amendment to the Constitution of the United States, and as also guaranteed by Article I, Section 16 of the Constitution of the State of Ohio.**

{¶9} In her first assignment of error, Norville makes two arguments. First, Norville argues that the trial court erred by determining that she is an unsuitable parent. Second, Norville argues that the trial court employed "gender bias" by granting Depinet legal custody of B.N. and S.N., but not C.N., Norville's minor son and B.N. and S.N.'s brother. In her third assignment of error, Norville argues that the trial court erred by summarily overruling her objection to the magistrate's decision in which she reasserted all of her objections raised at the final hearing.

{¶10} "An appellate court reviews the trial court's decision to adopt, reject or modify the Magistrate's decision under an abuse of discretion standard." *Tewalt v. Peacock*, 3d Dist. Shelby No. 17-10-18, 2011-Ohio-1726, ¶ 31, citing *Figel v. Figel*, 3d Dist. Mercer No. 10-08-14, 2009-Ohio-1659, ¶ 9, citing *Marchel v. Marchel*, 160 Ohio App.3d 240, 2005-Ohio-1499, ¶ 7 (8th Dist.). The trial court may adopt, reject, or modify the magistrate's decision. Civ.R. 53(D)(4)(b). When ruling on objections to the magistrate's decision, the trial court is "not required to

follow or accept the findings or recommendations of its magistrate." (Citations omitted.) *Stumpff v. Harris*, 2d Dist. Montgomery No. 21407, 2006-Ohio-4796, ¶ 16. Instead, the trial court "shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law." Civ.R. 53(D)(4)(d); *Stumpff* at ¶ 16. Accordingly, the trial court reviews the magistrate's decision under a de novo standard of review. *Stumpff* at ¶ 16.

{¶11} "'Decisions concerning child custody matters rest within the sound discretion of the trial court.'" *Krill v. Krill*, 3d Dist. Defiance No. 4-13-15, 2014-Ohio-2577, ¶ 26, quoting *Walker v. Walker*, 3d Dist. Marion No. 9-12-15, 2013-Ohio-1496, ¶ 46, citing *Wallace v. Willoughby*, 3d Dist. Shelby No. 17-10-15, 2011-Ohio-3008, ¶ 22 and *Miller v. Miller*, 37 Ohio St.3d 71, 74 (1988). "'"Where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court."'" *Id.*, quoting *Walker* at ¶ 46, quoting *Barto v. Barto*, 3d Dist. Hancock No. 5-08-14, 2008-Ohio-5538, ¶ 25 and citing *Bechtol v. Bechtol*, 49 Ohio St.3d 21 (1990), syllabus. "'Accordingly, an abuse of discretion must be found in order to reverse the trial court's award of child custody.'" *Id.*, quoting *Walker* at ¶ 46, citing *Barto* at ¶ 25 and *Masters v. Masters*, 69 Ohio St.3d 83, 85 (1994). "'An abuse of discretion suggests the trial court's decision is

unreasonable or unconscionable.'" *Id.*, quoting *Brammer v. Meachem*, 3d Dist. Marion No. 9-10-43, 2011-Ohio-519, ¶ 14, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "If there is some competent, credible evidence in the record to support the trial court's decision, there is generally no basis for a reviewing court to find an abuse of discretion." *In re Medure*, 7th Dist. Columbiana No. 01 CO 3, 2002 WL 31114919, *2, citing *Ross v. Ross*, 64 Ohio St.2d 203, 205 (1980).

{¶12} In this case, Norville disputes the trial court's decision granting Depinet, a nonparent, legal custody of B.N. and S.N. "It is without question that parents have a constitutionally protected due process right to make decisions concerning the care, custody, and control of their children, and the parents' right to custody of their children is paramount to any custodial interest in the children asserted by nonparents." *Rowell v. Smith*, 10th Dist. Franklin No. 12AP-802, 2013-Ohio-2216, ¶ 27, citing *In re Mullen*, 129 Ohio St.3d 417, 2011-Ohio-3361, ¶ 11, citing *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054 (2000), and citing *In re Murray*, 52 Ohio St.3d 155, 157 (1990) and *Clark v. Bayer*, 32 Ohio St. 299, 310 (1877). "Still, 'the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" (Citation omitted.) *In re B.N.R.*, 2d Dist. Montgomery No. 28662, 2020-Ohio-2852, ¶ 13, quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶13} In legal custody disputes between parents and nonparents under R.C. 2151.23(A)(2) "parents may be denied custody only if a preponderance of the evidence indicates abandonment, contractual relinquishment of custody, total inability to provide care or support, or that the parent is otherwise unsuitable that is, that an award of custody would be detrimental to the child." *In re Perales*, 52 Ohio St.2d 89, 98 (1977), citing *Clark* at 310. *See also In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, ¶ 17. Because the trial court determined that abandonment, contractual relinquishment of custody, and total inability to provide care and support were not indicated under the facts in the record, our analysis will focus only on the issue of unsuitability. Before awarding legal custody to a nonparent in a parentage action between a parent and a nonparent, a trial court must make a parental-unsuitability determination on the record. *Hockstock* at syllabus. "As long as the trial court's determination of unsuitability is supported by a substantial amount of credible and competent evidence, an appellate court will not disturb it." *Nicholas A. v. Joseph P.*, 5th Dist. Tuscarawas No. 2019 AP 03 0009, 2019-Ohio-4423, ¶ 19, citing *Radka v. McFall*, 9th Dist. Lorain No. 04CA008438, 2004-Ohio-5181, ¶ 7, citing *In re Adams*, 9th Dist. Wayne No. 01CA0026, 2001 WL 1338952 (Oct. 31, 2001).

{¶14} "Furthermore, in proceedings involving the custody and welfare of children, the power of the trial court to exercise discretion is peculiarly important."

*Id.* at ¶ 20, citing *In re Fout*, 5th Dist. Delaware No. 04 CA-F 05036, 2005-Ohio-4344, ¶ 6, citing *In re Rossantelli Children*, 5th Dist. Delaware No. 01CAF12072, 2002-Ohio-2525 (additional citations omitted). "Because custody issues are some of the most difficult and agonizing decisions a trial judge must make, he or she must have wide latitude in considering all the evidence." *Id.*, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997). "In analyzing the difficult decisions that must be made by trial courts in these situations, we remain mindful that unlike in a permanent custody proceeding where a juvenile court's standard of review is by clear and convincing evidence, the standard of review in legal custody proceedings is a preponderance of the evidence." *Id.*, citing *In re A.C.*, 12th Dist. Butler No. CA2006-12-105, 2007-Ohio-3350, ¶ 14. The nonparent seeking custody bears the burden of demonstrating that the parent is unsuitable. *Scavio v. Ordway*, 3d Dist. Shelby No. 17-09-07, 2010-Ohio-984, ¶ 22, citing *In re Porter*, 113 Ohio App.3d 580 (3d Dist.1996).

{¶15} Norville argues that the trial court erred by determining that she was an unsuitable parent to B.N. and S.N. and that an award of custody to Norville would be detrimental to the girls.

{¶16} In the magistrate's decision, the magistrate found by a preponderance of the evidence that Norville is unsuitable "under the standard that removing the children from the only stable environment that they have had for two years would

be detrimental and not in their best interest." (Doc. No. 39). The magistrate recommended that Depinet be granted legal custody of B.N. and S.N. (*Id.*).

{¶17} After conducting an independent review, the trial court overruled Norville's objections and adopted the magistrate's decision. (Doc. No. 49). The trial court noted that Norville has "provided [her] children with a childhood full of trauma." (*Id.*). The trial court referenced Jennifer L. Depinet's ("Jennifer") testimony that Norville's home was overcrowded and that "the home itself was a poor environment in which to raise young children." (*Id.*). The trial court found that photographs entered into evidence supported Jennifer's testimony regarding the poor condition of the home. (*Id.*). In particular, the trial court noted that the home was a particular health hazard to S.N. because she was too young to appreciate the "obvious hazards." (*Id.*).

{¶18} In its judgment entry, the trial court noted that Norville "seems to have a history of leaving these girls behind." (*Id.*). The trial court referenced the fact that although Norville enjoyed "sporadic" visitation with B.N. and S.N. when she believed the girls were in Jennifer's care, Norville did not engage in any visitation with B.N. or S.N. after the trial court granted her supervised visitation at Hannah's House in the September 13, 2018 judgment entry. (*Id.*). The trial court found that "[Norville's] excuse for not seeing her two girls from September 13, 2018 to the date of the hearings appears to be her ego." (*Id.*). In support of this contention, the

trial court referenced Norville's testimony that the reason she did not engage in supervised visitation with her daughters for a period of eight months was that she never had supervised visits with any of her other children and did not plan on starting supervised visitations now. (*Id.*). The trial court stated, "[o]ne would think a competent, caring parent would 'start now' because she loved her children, would want to see them, and check on their welfare." (*Id.*). The trial court noted that the fact that Norville was willing to forfeit visitations with B.N. and S.N. for an extended period of time, "and for no good reason," is evidence of Norville's lack of parental bond with B.N. and S.N. (*Id.*).

{¶19} The trial court made the following findings with respect to Norville's care of B.N. and S.N.:

> When Mother had the children in her care, there is evidence that she neglected their care and well being aside from the deplorable living conditions she provided. S.N. did not have her necessary shots and was also suffering with 8 cavities in her teeth. Additionally, Mother had no problem leaving S.N. in the care of a man that S.N. did not even know. Finally, a social worker, the CASA assigned to this case and S.N.'s adult sister all noted that S.N. had problems focusing and was always "bouncing off the walls," but [Depinet] had her seen by a medical professional who prescribed medication for S.N.'s condition.

S.N., with medication is, "a different kid" she is no longer "bouncing off the walls, unable to focus and shouting out." With medication S.N. can now focus and carry on a conversation. S.N. is no longer getting "bad notes" and she is "so much better in school." However, Mother found Plaintiff's intervention in helping S.N. objectionable and she was against S.N. being placed on medication, despite the improvements in S.N.'s behavior. Mother noted S.N. did not need medication while in her care but there was no evidence Mother even had S.N. medically evaluated. Since Mother did not address S.N.'s vaccinations in a timely fashion [and] failed to recognize S.N.'s need for dental attention, it is likely Mother also ignored S.N.'s disturbing behaviors, which if left unaddressed could negatively impact S.N.'s education and social development.

(Internal citations omitted.) (Doc. No. 49).

{¶20} The trial court also found that in the approximately one and one-half years that B.N. and S.N. have lived with Depinet, Norville has not supported them financially. (*Id.*). The trial court found, "Mother was content to have the children live with someone else, and allowed someone else to meet the children's needs. Mother failed to act responsibly toward these children only fitting them into her life when it was convenient for her to do so." (*Id.*). The trial court then juxtaposed

Norville's attitude toward the children with Depinet's willingness to sacrifice for them. (*Id.*). The trial court found that Depinet "has provided a clean home, medical care, counseling, and stability for these children." (*Id.*). The trial court also referenced the guardian ad litem's ("GAL") testimony that B.N. and S.N. wished to remain with Depinet. (*Id.*). The trial court concluded that after an independent review, there is "ample evidence" to support the magistrate's decision. (*Id.*). The trial court then overruled Norville's objections and adopted the magistrate's April 5, 2019 decision. (*Id.*). (*See* Doc. No. 50).

{¶21} We conclude that the trial court did not abuse its discretion by granting Depinet legal custody of B.N. and S.N. because a substantial amount of competent, credible evidence supports the trial court's finding that Norville is an unsuitable parent to B.N. and S.N. and that awarding custody to Norville would be detrimental to them.

{¶22} Several witnesses testified during the two-day hearing on Depinet's motion for legal custody of B.N. and S.N. Justin Johnson ("Johnson"), the principal for grades 5 through 12 at B.N.'s school, testified that he has known B.N., who at the time of the hearing was a freshman in high school, since her eighth-grade year and sees her every school day. (Feb. 28, 2019 Tr. at 13-15). Johnson testified that it was his understanding that B.N. had lived with Norville during the 2017-2018 academic year and was living with Depinet during the 2018-2019 academic year.

(*Id.* at 14). Johnson testified that he noticed an improvement in B.N.'s grades, effort, and participation in her courses from the 2017-2018 academic year to the 2018-2019 academic year. (*Id.* at 15-17). (*See* Plaintiff's Ex. 1). Johnson further testified that B.N. missed 12 days of school during the 2017-2018 academic year, but only missed 3 days during the 2018-2019 academic year. (Feb. 28, 2019 Tr. at 15, 22-23). (*See* Plaintiff's Ex. 1). Johnson further testified that Depinet was involved with B.N.'s education during the 2018-2019 academic year and that Depinet, not Norville, enrolled B.N. in school for the 2018-2019 academic year and attended her parent-teacher conferences. (Feb. 28, 2019 Tr. at 18-20).

Jennifer, Norville's adult daughter and B.N. and S.N.'s sister, also testified at the final hearing. (Feb. 28, 2019 Tr. at 30). Jennifer is the oldest of Norville's six children. (*Id.* at 38-39). Jennifer testified that she is in a relationship with Depinet's son, Blayne Depinet ("Blayne"), and has been living in Depinet's house since May 2017. (*Id.* at 32). Jennifer testified that B.N. and S.N. began living in Depinet's house with her in September 2017. (*Id.*). Immediately prior to living with Depinet, B.N. and S.N. lived with their siblings, Norville, and Robert in a home in New Riegel, Ohio. (*Id.* at 32, 35). Jennifer described the home in New Riegel as dirty, cluttered with soiled clothes and garbage, and infested with rodents. (*Id.* at 32-34). Additionally, Jennifer testified that the home had inadequate space for the number of residents and animals living there. (*Id.* at 32-33). Jennifer testified that

B.N. slept on the couch, which was infested with rodents, because her bedroom was cluttered and dirty, and S.N. slept in Norville's room. (*Id.* at 33-35). Plaintiff's Exhibit 10, a composite of photos of Norville's New Riegel house, depicted a house full of garbage, clutter, and animal feces. (*Id.* at 34-49). (*See* Plaintiff's Ex. 10). One of the photographs depicted a device for smoking marijuana sitting on a counter in the home. (Plaintiff's Ex. 10); (Feb. 28, 2019 Tr. at 39-40). Another photograph depicted B.N.'s room, which had clutter and trash throughout and dog feces on the carpeted floor. (Plaintiff's Ex. 10); (Feb. 28, 2019 Tr. at 46). Jennifer, who had lived in the house, testified that the New Riegel house was not a nice place to live and opined that it was not a suitable home for two girls to reside. (Feb. 28, 2019 Tr. at 49).

{¶23} Jennifer testified that during the summer of 2017, B.N. and S.N. were living in a camper with their parents and siblings because there was a warrant out for Robert's arrest and the family was "hiding out" to avoid Robert's arrest. (*Id.* at 36-37). Eventually, the camper was raided by law enforcement while B.N. and S.N. were present, and Robert was arrested. (*Id.* at 37-38).

{¶24} Additionally, Jennifer stated that she observed Norville under the influence of drugs while B.N. and S.N. were in her care. (*Id.* at 55-56). Jennifer recalled occasions of seeing white powder on the side of Norville's nose, which Jennifer believed was residue from drug use. (*Id.* at 55). Jennifer described a

September 2017 event which precipitated B.N. and S.N. moving into Depinet's home on a full-time basis. (Feb. 28, 2019 Tr. at 50, 59). Jennifer testified that she received a telephone call from B.N. telling her that Norville was "really sick." (*Id.* at 50). Jennifer took Norville to the hospital and while there, Jennifer overheard Norville tell a doctor that she had used carfentanil. (*Id.* at 51). While Norville was in the hospital, Depinet picked up the girls and took them to her home, where Jennifer had already been living for several months, to stay while Norville recovered. (*Id.* at 51, 59). Shortly thereafter, B.N. and S.N. began living with Depinet on a full-time basis. (*Id.* at 59-60). Soon thereafter, Robert and Norville ended their relationship, and Norville moved in with her sister and "kind of left everybody behind," including her children, who were living in the New Riegel home. (*Id.* at 59). Norville eventually began dating James Miller ("Miller") and moved into his home a short time later. (*Id.* at 68-70).

{¶25} Jennifer testified that the lifestyle she described, including running from law enforcement officers, police raids on their property, drug use in the home, and the house being unkept, was how she, B.N. and S.N. lived for several years in Norville's care. (*Id.* at 38). In contrast, Jennifer described Depinet's home, where the girls had been living for approximately a year and a half at the time of the final hearing, as being clean and appropriate with adequate space for its residents. (*Id.* at 31). At Depinet's house, B.N. and S.N. share a clean and organized bedroom, and

the girls have beds to sleep in. (*Id.* at 43). Moreover, Jennifer testified that there is not drug use in Depinet's house. (*Id.* at 58-59, 105). Jennifer testified that the girls regularly complete their schoolwork at Depinet's house. (*Id.* at 91). In contrast, while living with Norville, B.N.'s grades were "going downhill," and B.N. had to complete her homework at school because Norville's house was too chaotic. (*Id.* at 91-92). Jennifer also testified that when B.N. lived with Norville, there was a time when B.N. did not attend school regularly and would occasionally miss school to provide childcare for S.N. (*Id.* at 58). However, since living with Depinet, B.N. is attending school regularly and is involved in sports. (*Id.* at 57-58). S.N. is now enrolled in preschool and interacts with other children her age. (*Id.* at 99).

{¶26} Additionally, Jennifer testified that Depinet provides for B.N. and S.N.'s medical, dental, and vision needs. (Feb. 28, 2019 Tr. at 93-95, 102-104). Jennifer testified that when B.N. and S.N. lived with Norville, they did not regularly visit the pediatrician. (*Id.* at 93-94, 131-132). Consequently, S.N. was initially not able to enroll in preschool because she was not up-to-date on her vaccines. (*Id.* at 87-88). Jennifer testified that she and Depinet facilitated S.N.'s medical care, including getting her up-to-date on vaccines. (*Id.* at 94). Depinet also facilitated routine eye care for B.N. and S.N. (*Id.* at 99-100). Additionally, Jennifer testified that B.N. and S.N. have received appropriate dental care since living in Depinet's home. (*Id.* at 102-104). In fact, when S.N. visited the dentist for the first time since

she moved into Depinet's home, S.N. had multiple cavities, which Depinet facilitated getting filled. (*Id.* at 103-104). S.N. also attends counseling that Depinet pays for, which Jennifer testified has been beneficial to S.N. (*Id.* at 106).

{¶27} Moreover, Jennifer testified that S.N.'s behavior has improved dramatically since she moved into Depinet's home. (*Id.* at 57-58). Since moving in with Depinet, S.N. has been diagnosed with ADHD and is in occupational therapy to improve her ability to focus. (*Id.* at 99-102). S.N. also takes prescribed medication to help her focus. (*Id.* at 99-101, 119-120). Jennifer stated that she has noticed a substantial improvement in S.N.'s behavior since she began therapy and medication and described S.N. as a "completely different kid" who is now able to focus and carry on a proper conversation. (*Id.* at 128-129). Jennifer testified that S.N. also displayed hyperactive behaviors when she was living with Norville. (*Id.* at 128). However, Norville never sought a diagnosis, treatment, or medication for S.N. (*Id.* at 101).

{¶28} Additionally, Jennifer stated that Depinet supports B.N. and S.N. financially. (*Id.* at 57). In fact, in the many months that B.N. and S.N. have lived with Depinet, Norville provided almost no financial support for the girls. (*Id.* at 90-91). Rather, Depinet pays for B.N. and S.N.'s living expenses, including medical and dental care, therapy, counseling, school enrollment and tuition, and athletics. (*Id.* at 57, 107-108).

{¶29} Jennifer testified that since B.N. and S.N. began living with Depinet in the fall of 2017, Norville saw the girls sporadically, including on a handful of weekend or overnight visits. (Feb. 28, 2019 Tr. at 61-64, 132-135). During these visits, B.N. and S.N. met Miller several times. (*Id.* at 70-72). Following a weekend visit during Labor Day weekend in 2018, B.N. was very upset and told Jennifer that Miller made comments about B.N.'s physical appearance—specifically that B.N. looked like Norville, walked like Norville, and wears similar underwear to Norville. (*Id.* at 72-77). Jennifer testified that B.N. was very upset by Miller's comments. (*Id.* at 76-77). Shortly thereafter, Norville came to Depinet's house with law enforcement officers and removed B.N. and S.N. from Depinet's home against the girls' wishes. (*Id.* at 86-89). After Norville removed B.N. and S.N. from Depinet's home, Depinet immediately petitioned the trial court for emergency custody of the girls. (*Id.* at 86). The trial court granted Depinet's petition for emergency custody, and the girls were returned to Depinet's home the following week, where they have remained ever since. (*Id.* at 86-88). Jennifer testified that Norville has not exercised court-ordered visitation with B.N. and S.N. since the trial court granted Depinet emergency custody of the girls, and Norville has only seen the girls at a basketball game. (*Id.* at 104). Moreover, although S.N. initiates telephone conversations with her mother, Norville has only initiated telephone contact with S.N. approximately five times in the time that S.N. has been living with Depinet. (*Id.* at 104-105).

{¶30} Jennifer testified that her younger brother, C.N., lived with Depinet throughout the summer of 2018, upon his release from a juvenile detention center. (*Id.* at 64). However, C.N. became violent with the girls. (*Id.* at 66, 68). Jennifer testified specifically about an incident when C.N. "got physical" during a visit to the doctor's office, shoved her, and then pulled B.N. off of the examination table. (*Id.* at 66). Following that incident, C.N. returned to Norville's care, where he remained at the date of the hearing. (*Id.*).

{¶31} Jennifer opined that it is in B.N. and S.N.'s best interest for the trial court to grant Depinet legal custody of the girls. (*Id.* at 40, 106). Jennifer testified that she would be "extremely concerned" for B.N. and S.N. if they were returned to Norville's care, citing Norville's lifestyle, drug use, and the inadequate amount of space for the girls in Norville's current home. (*Id.* at 40, 54).

{¶32} Ryan Hampshire ("Hampshire"), a caseworker with the Seneca County Department of Job and Family Services ("JFS"), testified that on August 27, 2018, his office received a complaint regarding possible sexual abuse and neglect of B.N. and S.N. by Miller and Norville. (Feb. 28, 2019 Tr. at 146-148). After speaking to the relevant parties, Hampshire concluded that the specific allegations of sexual abuse and neglect were unsubstantiated. (*Id.* at 150). However, Hampshire testified that, through his investigation, he concluded that some "very inappropriate" interactions had occurred between Miller and B.N. (*Id.* at 154).

Nevertheless, because Depinet had received temporary custody of B.N. and S.N. and Miller, the alleged perpetrator, no longer had access to the girls, Hampshire determined that no further services from his agency were indicated. (*Id.* at 150, 152). Hampshire testified that if B.N. and S.N. were living with Norville and Miller, he would have taken additional steps in his investigation. (*Id.* at 152-154).

{¶33} Depinet testified at the final hearing in support of her complaint for legal custody of B.N. and S.N. (*Id.* at 159). Depinet stated that her first connection to the Norville family was when her son, Blayne, began dating Jennifer. (*Id.* at 161-162). In the summer of 2017, Jennifer began living with Blayne at Depinet's home. (*Id.* at 162). At that time, B.N. and S.N. began visiting Jennifer at Depinet's home and would occasionally spend the night. (*Id.* at 162-163). Depinet testified that in August of 2017, she became concerned about the girls' well-being when she learned that they were living in a camper in a local campground and that there was a warrant issued for Robert's arrest. (*Id.* at 163-164). Following the raid of the camper and Norville's hospitalization, B.N. and S.N. began to live with Depinet full-time. (*Id.* at 164-166). Depinet testified that, initially, she believed that once Norville was feeling better, she would take an interest in B.N. and S.N. and want them back. (*Id.* at 165-166, 217). However, Norville did not take an interest in the girls after she recovered. (*Id.* at 166, 217). Depinet testified that once B.N. and S.N. began living in her home full-time in September 2017, they have lived with her continuously ever

since, with the exception of the week they were returned to Norville in September 2018 before the trial court granted Depinet's petition for temporary emergency custody of the girls. (*Id.* at 167-168).

{¶34} Depinet testified to B.N. and S.N.'s physical condition when they first came into her care. (*Id.* at 168). According to Depinet, B.N. had a burn on her chest and S.N. was suffering from a severe diaper rash. (*Id.*). Depinet treated both of the girls' conditions. (*Id.*). Depinet testified that when the girls entered her care, they were also behind on their medical care. (*Id.* at 170). When Depinet registered S.N. for preschool, she learned that she was behind on her vaccines, and Depinet subsequently took her to a doctor's appointment to get her up-to-date. (*Id.*). Additionally, the girls needed dental care. (*Id.*). At S.N.'s first dental appointment since entering Depinet's care, the dentist found eight cavities in the four-year-old's mouth. (*Id.*). Depinet facilitated getting S.N.'s cavities filled and paid the bills. (*Id.* at 170-171). Additionally, both girls required glasses. (*Id.* at 171-173).

{¶35} Depinet testified to a number of behavioral issues that S.N. exhibited when she first came into Depinet's care. (Feb. 28, 2019 Tr. at 172-174, 177). Through a series of interactions with professionals, S.N. was diagnosed with ADHD and sensory issues. (*Id.* at 173-175). As a result of her diagnosis, S.N. takes medication and is enrolled in occupational therapy. (*Id.* at 175). Depinet testified that she has noticed an improvement in S.N.'s behavior since she began treatment.

(*Id.* at 175-176). Depinet further testified that when she entered her care, S.N. commonly used profanity. (*Id.* at 177). Depinet testified that S.N. now understands that she cannot use profanity in her home. (*Id.*). S.N. is currently enrolled in preschool and is doing well. (*Id.* at 179-180). When she began preschool, her behavior was a concern, but Depinet testified that S.N.'s behavior in preschool has greatly improved and she no longer received "bad notes" from school. (*Id.* at 179).

{¶36} Depinet testified that C.N., who was twelve years old at the time, lived with her during the summer of 2018. (Feb. 28, 2019 Tr. at 184). However, at the end of the summer, C.N. was violent with the girls in a doctor's office. (*Id.* at 186); (Mar. 7, 2019 Tr. at 337). Depinet also described an incident where C.N. pointed a BB gun at B.N. and S.N.'s heads and threatened to kill them. (Feb. 28, 2019 Tr. at 186-187); (Mar. 7, 2019 Tr. at 337). He later broke the gun in half with a baseball bat. (Feb. 28, 2019 Tr. at 186-187). Depinet testified that following the violent incidents, C.N. returned to Norville's home where he remained at the time of the final hearing. (*Id.* at 187); (Mar. 7, 2019 Tr. at 337-338). Depinet testified that until the incidents, C.N. did well in Depinet's care. (Mar. 7, 2019 Tr. at 338). Depinet further testified that she would be open to having C.N. live in her home if she was empowered to provide him with the counseling that he needs. (*Id.* at 338-339).

{¶37} Depinet confirmed Jennifer's testimony that after B.N. and S.N. moved in with Depinet in September 2017, they had sporadic and inconsistent

visitation with Norville until September 2018. (Feb. 28, 2019 Tr. at 180-189). Depinet testified that from September 2017 through the date of final hearing, B.N. had four overnight visitations with Norville and S.N. had five overnight visitations with Norville. (*Id.* at 189). Depinet testified that she was aware of the concerns that B.N. expressed to Jennifer regarding statements Miller made to B.N. (*Id.* at 189-190). After consulting legal counsel, Depinet contacted JFS to report the incident. (*Id.*). Shortly thereafter, on September 5, 2018, Norville arrived at Depinet's home with law enforcement officers to remove B.N. and S.N. from the residence. (*Id.* at 191-192). Thereafter, Depinet sought and obtained emergency custody of B.N. and S.N. (*Id.* at 192).

{¶38} Depinet testified that immediately after she obtained emergency custody of B.N. and S.N., she contacted Hannah's House and completed her initial intake so that the girls could have supervised visitation with Norville in accordance with the emergency order. (*Id.* at 195). However, Norville did not make contact with Hannah's House. (*Id.* at 196). Accordingly, Norville did not exercise visitation with B.N. and S.N. at Hannah's House. (*Id.*). According to Depinet, B.N. and S.N. have not expressed a desire to live with Norville. (*Id.* at 206). In fact, B.N. wants very limited contact with Norville. (*Id.*).

{¶39} Depinet attested that she provides a clean, safe home for B.N. and S.N. (*Id.* at 194). According to Depinet, B.N. and S.N. are comfortable at her home and

have adjusted well to living there. (*Id.* at 206-207). Depinet testified that she loves B.N. and S.N. and she desires to give the girls "the best opportunity at life." (*Id.* at 193-194). Depinet has also provided financially for B.N. and S.N. since September 2017, including medical and dental care, school tuition, and occupational therapy. (*Id.* at 200-205, 209-210). (*See* Plaintiff's Exs. 2, 5, 6, 8).

{¶40} Miller testified at the hearing that he has been in a relationship with Norville for approximately one year and that Norville has lived with him in his two-bedroom trailer since July 2018. (Feb. 28, 2019 Tr. at 256-257, 259). Miller admitted that B.N. and S.N. do not currently have bedrooms at his residence because he and Norville occupy one of the bedrooms and C.N. occupies the other bedroom. (*Id.* at 265-266). Miller admitted that he once took a photo of B.N. while she was sleeping, but denied that he knew that it made her uncomfortable. (*Id.* at 263-264, 269). Miller further acknowledged that he told B.N. on multiple occasions that she resembles her mother and conceded that he could understand how those comments could have made B.N. uncomfortable. (*Id.* at 264-265).

{¶41} Norville testified on her own behalf at the final hearing. (Mar. 7, 2019 Tr. at 283). Norville attested that it was her understanding that she was sending B.N. and S.N. to live with their sister, Jennifer, while she left Robert. (*Id.* at 313). Norville testified that she believed that Jennifer was planning on moving out of Depinet's home and into a residence of her own, although she knew that Jennifer

was living with Depinet at the time that she placed the girls in Jennifer's care. (*Id.* at 313-314).

**{¶42}** Norville denied ever being addicted to any drug and specifically denied that she was hospitalized for an addiction to carfentanil or fentanyl. (*Id.* at 283-284, 308, 313). Norville denied that the New Riegel home that she was living in with the children was in disrepair while she lived there. (*Id.* at 307-308, 325). Rather, she stated that the home fell into disrepair after she moved out and was therefore "out of [her] control." (*Id.* at 307-308). Norville also denied that her family was hiding from the police when they were staying in the camper. (*Id.* at 319-320).

**{¶43}** Norville admitted that she lived in a two-bedroom residence with Miller and C.N. and that the girls do not currently have bedrooms at her home. (*Id.* at 300). However, she testified that she has "checked into buying a few different places" and would be willing to move into a house with three bedrooms so that the girls would have a bedroom to share. (*Id.* at 300-301). Norville admitted that she moved into Miller's residence after knowing him for only a few months, and she stated that if B.N. and S.N. had been living with her at the time, they would have moved into Miller's residence as well. (*Id.* at 320). According to Norville, B.N. and S.N. are not afraid of Miller. (*Id.* at 284-285). Norville admitted that C.N. has struggled with anger and legal problems, but denied that B.N. and S.N. feel

uncomfortable around him. (*Id.* at 317-318). With respect to Jennifer and Depinet's allegation that C.N. was mean to the girls, Norville testified, "They're siblings, they're [going to] bicker, they're [going to] fight, they're [going to] not get along." (*Id.* at 330).

{¶44} Norville expressed concern that S.N. was on medication for hyperactivity and stated, "I don't want my children on any type of medication * * * at all. It's not good." (Mar. 7, 2019 Tr. at 303). Norville testified that although she understands that a doctor prescribed the medication to S.N., she does not believe that her children should be on medication. (*Id.* at 304-306). However, Norville admitted that she has not seen S.N. since she began taking the medication. (*Id.* at 303). Norville also denied that B.N. and S.N. were not up-to-date on their shots, had cavities in their teeth, and had not received appropriate medical treatment when they began living in Depinet's home. (*Id.* at 309-310).

{¶45} Norville testified that she tried to remove her children from Depinet's home "multiple times." (*Id.* at 316). However, she testified that Jennifer convinced her to keep the girls in Depinet's home so that the three sisters could remain together. (*Id.* at 351-353). Norville testified that she was under the impression that when she settled into a different work schedule and took care of her son's legal situation, B.N. and S.N. would return to her care once again. (*Id.* at 351-355).

**{¶46}** Norville admitted that she did not exercise supervised visitation with B.N. and S.N. after the trial court granted Depinet emergency custody of the girls. (*Id.* at 311). In support of her decision not to exercise her court-ordered visitation, Norville stated, "I have never had to [have] supervised visits with any of my six kids, why should I start now?" (*Id.*). However, Norville testified that she did see the girls at a basketball game after the temporary custody order went into effect. (*Id.*).

**{¶47}** Kara Schoen ("Schoen"), the GAL assigned to the case, was the final witness. Schoen testified that she met B.N. and S.N. on several occasions during the course of her investigation. (Mar. 7, 2019 Tr. at 368). However, she never observed B.N. and S.N. interact with Norville because they were not living with Norville and Norville was not exercising supervised visitations. (*Id.*). Schoen testified that Norville indicated that she was not welcome in her home, and as a result, Schoen was unable to view Norville's home. (*Id.* at 369, 392). Schoen testified that Norville told her multiple times that she was not willing to see her children in a supervised setting. (*Id.* at 370). Schoen stated that Norville's unwillingness to visit the children in a supervised setting was concerning. (*Id.*).

**{¶48}** In contrast, Depinet was cooperative with Schoen, and Schoen had the opportunity to observe the children inside Depinet's home on multiple occasions and spoke with everyone that lived in the home. (*Id.* at 370-372). Schoen testified

that the girls appeared to be flourishing in Depinet's care. (*Id.* at 375). Schoen stated that she does not have any concerns with B.N. and S.N. remaining with Depinet. (*Id.* at 379). The girls both appear to be doing well educationally, and Schoen believes that their medical needs are being met in Depinet's care. (*Id.* at 382). Schoen observed S.N. both before and after she began taking medication for her hyperactive behavior, and she testified that she noticed a positive change in S.N.'s behavior. (*Id.* at 372-373). In fact, Schoen described S.N. as "a different kid" who was calmer and more focused. (*Id.* at 373). Schoen also described the academic progress S.N. made while living with Depinet. (*Id.* at 374-375). Schoen further testified that she did not believe that there was any mental illness, drug use, or excessive alcohol use in Depinet's home. (*Id.* at 384).

{¶49} In contrast, Schoen testified that she had concerns about the condition of Norville's home. (Mar. 7, 2019 Tr. at 376-377). Additionally, Schoen did not believe that the girls' medical needs were being met in Norville's care. (*Id.* at 382). Moreover, Schoen expressed concerns with B.N. and S.N. being around Miller. (*Id.* at 389-390, 393-394). Schoen testified that she discussed concerns regarding Miller with Norville and that Norville appeared to "brush off" the concerns as not credible. (*Id.* at 389-390). Schoen testified that she found Norville's response to the girls' concerns regarding Miller to be troubling. (*Id.* at 390). Schoen stated that she had

concerns regarding mental illness, alcohol, and drug use in Norville's home. (*Id.* at 384-385).

{¶50} Schoen testified that both girls expressed that they wanted to continue to live in Depinet's home. (*Id.* at 379). According to Schoen, S.N. stated that she wanted to have visitations with her mom, but that she wanted to continue living with Depinet. (*Id.*). However, she stated that B.N. does not have an interest in seeing Norville or speaking to her on the phone. (*Id.* at 379-380).

{¶51} Schoen recommended that B.N. and S.N. continue to live with Depinet. (*Id.* at 396). Schoen stated that Depinet's home is the only place that the girls have known as "home" for the last two years and that the girls have never lived in the home where Norville is currently residing. (*Id.*).

{¶52} A review of the evidence deduced at the final hearing demonstrates that the trial court's determination that Norville was an unsuitable parent to B.N. and S.N. was supported by competent, credible evidence. Thus, the trial court did not abuse its discretion by granting Depinet's complaint for legal custody of B.N. and S.N. *See Liles v. Doyle*, 3d Dist. Allen No. 1-13-48, 2014-Ohio-1681, ¶ 47-53 (finding that the biological father was an unsuitable parent where he did not create a bond with the child, lacked consistent visitation with the child, routinely allowed other individuals to care for the child, and "failed to demonstrate that he could offer K.J.D. a stable environment * * *."); *Evans v. Evans*, 2d Dist. Champaign No. 2012

CA 41, 2013-Ohio-4238, ¶ 35 (upholding the trial court's unsuitability finding and conclusion that "it would be physically, mentally, and emotionally detrimental" for the child to be in the parent's custody where the parent failed to exercise parenting time, the house was unclean, meals were not regularly provided, and there were allegations of physical and emotional abuse); *In re A.S.*, 7th Dist. Jefferson No. 11 JE 29, 2012-Ohio-5468, ¶ 11-12 (concluding that the trial court did not abuse its discretion by upholding the magistrate's finding that the parent was unsuitable where the parent was "unwilling or unable to care for the child for long periods of time, creating instability in the child's life as the child's care was routinely handed over to others," was in unstable romantic relationships, and was living in "filth").

{¶53} Having concluded that the trial court did not err by determining that Norville was an unsuitable parent to B.N. and S.N. and that an award of custody to Norville would be detrimental to the girls, we next address Norville's argument that the trial court engaged in "gender bias." Norville argues that the trial court engaged in unconstitutional "gender bias" by "bending * * * over backward[ ]" "to unconstitutionally find that [Norville] is unsuitable to raise her minor girls, but suitable to raise her minor boy." (Appellant's Brief at 8).

{¶54} With respect to C.N., the trial court found as follows:

Mother claims [Depinet] is disingenuous as the girls' sibling, [C.N.],

returned to live with his mother "thereby totally negating the

Magistrate's decisive premise that Mother * * * was an unsuitable parent." However the testimony on this topic showed that [C.N.] did not act appropriately with his sisters and was violent toward them and so he returned to his Mother. Unfortunately, [C.N.] has been in trouble since returning to Mother and his leaving [Depinet's home] has been for the best. His continued misbehavior reflects more negatively on Mother, the person who raised him, than on [Depinet] for insisting he behave and allowing him to leave when he did not.

(Internal citations omitted.) (Doc. No. 49).

{¶55} However, here, the trial court did not make any finding with regard to Norville's suitability or unsuitability to raise C.N. because Depinet only filed for legal custody of B.N. and S.N. Therefore, because the suitability of Norville as a parent to C.N. was not an issue before the trial court, the trial court did not make specific findings regarding Norville's suitability to parent C.N. Thus, Norville's argument that the trial court employed "two standards" for finding unsuitability, based on the gender of the minor children, is erroneous based on the procedural posture of the case.

{¶56} To the extent that Norville is attempting to argue that the trial court's finding that Norville is an unsuitable parent is disingenuous because C.N. returned to live with his mother, this argument also fails. The evidence presented at the final

hearing demonstrates that C.N. did not behave appropriately with his sisters and was violent toward them. Jennifer and Depinet testified to an incident at a doctor's office where C.N. pushed B.N. off the exam table. Additionally, Depinet testified to a related incident where C.N. pointed a BB gun at B.N. and S.N.'s heads and threatened to kill them. Following these violent incidents, Depinet allowed C.N. to move back with his mother, seemingly in an effort to protect B.N. and S.N. from C.N.'s aggressive and unpredictable behavior. Norville's own testimony regarding C.N.'s behavior, anger, and legal issues supports Depinet's concerns regarding C.N.'s presence around the girls. Furthermore, at no time did Depinet testify that she was seeking custody of B.N. and S.N. because they are female or that she was not seeking custody of C.N. because he is male. Rather, Depinet testified that she had enjoyed having C.N. live in her home until the time that he became violent and inappropriate with his sisters and that she would be open to allowing him to live with her in the future if she was able to enroll him in appropriate counseling. Accordingly, the record does not support Norville's argument that Depinet's motive in seeking legal custody of B.N. and S.N. was based on their gender or that the trial court's finding that Norville was an unsuitable parent to B.N. and S.N. was based on gender.

{¶57} Accordingly, Norville's first assignment of error is overruled.

{¶58} In her third assignment of error, Norville argues that the trial court erred by summarily overruling her objection to the magistrate's decision in which reasserted all of her objections raised at the final hearing. For the reasons that follow, we disagree.

{¶59} In her objections to the magistrate's decision, Norville submitted a general objection incorporating by reference all objections made on her behalf during the final hearing. (Doc. No. 40). The trial court overruled Norville's objection and noted that in this "catchall" objection, Norville did not direct the court to specific objections or rulings made. (Doc. No. 49). Nevertheless, the trial court stated that it reviewed the transcript and that although it found that "there were a few objections that were not decided correctly," the errors "would not change the ultimate ruling in [the] matter given the weight of the admissible evidence in support of the Magistrate's Decision." (*Id.*). Norville contends that the trial court erred by "ambiguously" finding that several objections were decided incorrectly but failing to identify which objections were incorrectly decided. (Appellant's Brief at 13-14).

{¶60} Civ.R. 53(D)(3)(b) provides that objections to a magistrate's decision "shall be specific and state with particularity all grounds for objection." "When an objecting party fails to state an objection with particularity as required under Civ.R. 53(D)(3)(b)(ii), the trial court may affirm the magistrate's decision without considering the merits of the objection." *Wallace v. Willoughby*, 3d Dist. Shelby

No. 17-10-15, 2011-Ohio-3008, ¶ 20, citing *Triozzi-Hartman v. Hartman*, 11th Dist. Geauga No. 2006-G-2701, 2007-Ohio-5781, ¶ 15, citing *Waddle v. Waddle*, 11th Dist. Ashtabula No. 2000-A-0016, 2001 WL 314659. Reviewing Norville's objection, which baldly reasserts all objections asserted on her behalf at the final hearing, we find that it does not meet the specificity requirement set forth in Civ.R. 53(D)(3)(b)(ii). Consequently, Norville is precluded from assigning the trial court's disposition of her objection as error on appeal. *See id.* at ¶ 21; Civ.R. 53 (D)(3)(b)(iv) ("Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion * * * unless the party has objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b).").

{¶61} Furthermore, App.R. 16(A)(7) provides that the appellant shall include in its brief "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." Here, Norville fails to direct this Court to specific statements in the trial transcript, as required by App.R. 16(A)(7), or develop an argument explaining how any of the objections or a combination thereof, if indeed decided incorrectly, would change the outcome of the lower court's decision. *See State v. Franks*, 9th Dist. Summit No. 28533, 2017-Ohio-7045, ¶ 15. "Where an

appellant fails to develop an argument in support of his assignment of error, this Court will not create one for him." *Id.* at ¶ 16, citing *State v. Harmon*, 9th Dist. Summit No. 26426, 2013-Ohio-2319, ¶ 6, citing App.R. 16(A)(7) and *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998). "'If an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out.'" *Id.*, quoting *Cardone* at *8.

{¶62} Accordingly, Norville's third assignment of error is overruled.

{¶63} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**